# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| GAMCO ASSET MANAGEMENT INC.,<br><br>Plaintiff,<br><br>v.<br><br>iHEARTMEDIA INC.,<br>iHEARTCOMMUNICATIONS, INC.,<br>BAIN CAPITAL PARTNERS, LLC,<br>THOMAS H. LEE PARTNERS, L.P.,<br>ROBERT W. PITTMAN, VINCENTE<br>PIEDRAHITA, BLAIR HENDRIX,<br>DANIEL G. JONES, OLIVIA SABINE,<br>CHRISTOPHER TEMPLE, DALE W.<br>TREMBLAY and DOUGLAS L. JACOBS,<br><br>Defendants,<br><br>-and-<br><br>CLEAR CHANNEL OUTDOOR<br>HOLDINGS, INC.<br><br>Nominal Defendant. | C.A. No. 12312-VCS |

## MEMORANDUM OPINION

Date Submitted: September 12, 2016
Date Decided: November 23, 2016

Norman M. Monhait, Esquire of Rosenthal Monhait & Goddess, P.A. of Wilmington, Delaware; Vincent R. Cappucci, Esquire, Andrew J. Entwistle, Esquire, and Joshua K. Porter, Esquire of Entwistle & Cappucci LLP, New York, New York; Mark Lebovitch, Esquire, Christopher J. Orrico, Esquire, and John Vielandi, Esquire of Bernstein Litowitz Berger & Grossmann LLP, New York, New York; and Ned Weinberger, Esquire of Labaton Sucharow LLP, Wilmington, Delaware, Attorneys for Plaintiff.

William B. Chandler III, Esquire, Bradley D. Sorrels, Esquire, Shannon E. German, Esquire, and Lori W. Will, Esquire of Wilson Sonsini Goodrich & Rosati, P.C., Wilmington, Delaware; David E. Ross, Esquire and Bradley R. Aronstam, Esquire of Ross Aronstam & Moritz, LLP, Wilmington, Delaware; and Kevin B. Huff, Esquire, David L. Schwarz, Esquire, and Daniel V. Dorris, Esquire of Kellogg Huber Hansen Todd Evans & Figel, PLLC, Washington, D.C., Attorneys for Defendants iHeartMedia, Inc., iHeartCommunications, Inc., Bain Capital Partners, LLC, and Thomas H. Lee Partners, L.P.

**SLIGHTS, Vice Chancellor**

Plaintiff, GAMCO Asset Management Inc., invested in nominal defendant, Clear Channel Outdoor Holdings, Inc. ("CCOH"), when it knew that CCOH was locked in a contractually-created symbiotic relationship with its former parent, iHeartCommunications, Inc. ("iHC"). Through a suite of intercompany agreements between CCOH and iHC, negotiated and executed when CCOH was still a wholly-owned subsidiary of iHC, the parties agreed to position iHC so that it could exercise significant control over nearly every aspect of CCOH's operations. These intercompany agreements were put in place in anticipation of an initial public offering of CCOH's stock in 2005.

By any measure, the intercompany agreements are highly favorable to iHC. For instance, iHC contracted to provide comprehensive management, IT, legal and executive services to CCOH. The two entities entered into mutual financing commitments that included an agreement whereby CCOH would sweep its excess cash to iHC on a daily basis. And, through a so-called Master Agreement, iHC secured the right to pre-approve any significant acquisition or disposition of assets and any significant debt financing that CCOH might wish to undertake. The Prospectus for the 2005 IPO disclosed these intercompany agreements in detail.

In 2012, stockholders of CCOH brought derivative suits in this Court alleging that iHC was abusing its position as controlling stockholder of CCOH by exploiting the various intercompany agreements, with the consent or acquiescence

1

of the CCOH Board of Directors, to the detriment of CCOH and its stockholders. At the time of the 2012 litigation, iHC was indebted to CCOH for over $600 million on an intercompany revolving note that was integral to some of the intercompany agreements. With approval of the Court, the 2012 litigation was settled after an independent Special Litigation Committee of CCOH (the "SLC") determined that CCOH could not breach, or even modify, the various intercompany agreements with iHC because to do so would bring potentially irreparable consequences to CCOH. The SLC negotiated a forward-looking settlement that featured corporate governance reforms designed to address iHC conflicts on the CCOH Board and to more carefully manage CCOH's ongoing relationship with iHC under the intercompany agreements.

Less than three years later, in a move that might have inspired the great Yogi Berra,[1] GAMCO filed a Verified Stockholder Derivative Complaint ("Complaint") against members of the CCOH Board, iHC, an iHC affiliate and certain financial sponsors, in which it resurrects many of the same derivative claims that were prosecuted in 2012 and settled in 2013. GAMCO alleges that the CCOH Board's undisputed compliance with the forward-looking provisions of the settlement agreement brokered in 2013 does not excuse its failure to extricate CCOH from the

---

[1] "It's like déjà vu all over again." Yogi Berra Museum & Learning Center, *Yogisms*, www.yogiberramuseum.org/just-for-fun/yogisms.

2

intercompany agreements in the face of iHC's deteriorating financial condition. GAMCO also alleges that the CCOH Board breached its fiduciary duties and committed corporate waste when it approved a debt offering and discrete asset sales in order to fund special dividends for the purpose of enabling iHC to address its acute need for liquidity.

The defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6). They argue that GAMCO's claims relating to the intercompany agreements are barred by the settlement of the 2012 litigation and the doctrine of *res judicata*. They also contend that the CCOH Board's decisions to sell assets, take on debt and declare dividends, which affected all CCOH stockholders equally, are protected by the business judgment rule.

For reasons explained below, I conclude that GAMCO's claims relating to the intercompany agreements must be dismissed because they are barred either by the 2013 settlement agreement and release or by *res judicata*. As for the claims relating to the asset sales and debt offering, I conclude that they also must be dismissed because the challenged transactions were arms-length transactions with third-parties that resulted in *pro rata* benefits to all CCOH shareholders. The Board's approval of these transactions is subject to the presumption of the business judgment rule and GAMCO has failed to allege facts that even come close to overcoming this presumption. Because GAMCO has failed to state a claim for

3

breach of fiduciary duty, its claim for aiding and abetting a breach of fiduciary duty against iHC, its affiliate and financial sponsors must also be dismissed. Finally, GAMCO's claim for unjust enrichment against iHC, *et al.* must be dismissed because the theory underlying the claim is duplicative of, and not materially broader than, its breach of fiduciary duty claims.

## I. BACKGROUND

The facts are drawn from allegations in the Complaint, documents integral to the Complaint and matters of which the Court may take judicial notice.[2]

### A. The Parties

GAMCO is a Delaware corporation that provides investment advisory services to open and closed-end funds, institutional and private wealth management investors and investment partnerships. At the time it filed the Complaint, GAMCO, along with certain of its affiliates, owned 9.9% of the outstanding publicly-traded Class A common stock of CCOH.

---

[2] *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *8 (Del. Ch. Oct. 24, 2014) ("'A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents.'") (citation omitted); *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014) (on a motion to dismiss, the Court may rely on documents extraneous to a complaint "when the document, or a portion thereof, is an adjudicative fact subject to judicial notice.") (footnotes and internal quotation marks omitted); *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *5 (Del. Ch. Dec. 22, 2010) (same).

Defendant iHeartMedia, Inc. ("iHM") is a Delaware corporation engaged in the mass media industry. Through its subsidiaries, iHM owns and operates more than 850 radio stations throughout the United States, making it the largest owner and operator of radio stations in the nation.

iHC, formerly known as Clear Channel Communications, Inc., is a Texas corporation and an indirect wholly-owned subsidiary of iHM. iHC owns approximately 90% of CCOH's outstanding shares, including more than 10,000,000 shares of Class A common stock and 315,000,000 shares of Class B common stock, representing approximately 99% of the total voting power of CCOH stockholders (collectively with iHM, the "iHeart Defendants").

Defendants Bain Capital Partners, LLC and Thomas H. Lee Partners, LP are a Massachusetts limited liability company and a Delaware limited partnership, respectively. Both are private equity funds. Together they own 67% of iHM's stock and control iHC with the power to seat all but two of iHC's directors and to appoint iHC's management (collectively, the "Private Equity Defendants").

Defendants Robert W. Pittman, Vincente Piedrahita, Blair E. Hendrix, Daniel G. Jones, Olivia Sabine, Christopher M. Temple, Dale W. Tremblay and Douglas L. Jacobs comprise the CCOH Board of Directors (the "CCOH Board" or "Board"). Pittman is the Executive Chairman of the Board and has served as

5

CCOH's CEO since 2011.  He also serves as a member of the Board of Directors and CEO of iHM and iHC.

Nominal Defendant CCOH is a Delaware corporation.  It is among the largest providers of outdoor or "out-of-home" advertising in the United States and throughout the world.  It owns and operates more than 650,000 outdoor advertising displays worldwide and generated in excess of $2.7 billion in revenue in 2015.

## B.     The Intercompany Agreements

In November 2005, iHC initiated an initial public offering in which it offered 35 million shares of CCOH's Class A common stock for sale to the public.  iHC retained a majority stake in CCOH (owning 90% of all outstanding shares) and 99% of the voting power.  In advance of the IPO, iHC and CCOH entered into several intercompany agreements (the "Intercompany Agreements") which govern the relationship between the two entities.  These Intercompany Agreements include a Master Agreement, a Corporate Services Agreement, an Employee Matters Agreement, a Tax Matters Agreement and a Trademark License Agreement.  Most relevant to this litigation are the Master Agreement and the Corporate Services Agreement.

The Master Agreement subjects CCOH to a variety of management and corporate governance restrictions that limit its ability to access external funding as well as its ability to make capital investments.  For instance, CCOH must obtain

6

iHC's approval to acquire or dispose of assets in excess of $5 million and before incurring more than $400 million in debt. CCOH is also obliged to accept certain management services from iHC including treasury, payroll, cash management, executive officer services, human resources and benefit services, legal services and IT support.

The Corporate Services Agreement memorialized a cash management sweep arrangement whereby all cash generated from CCOH's operations that remains after CCOH pays its accounts payable and payroll is transferred daily to iHC in exchange for a receivable in the form of a revolving promissory note, dated November 10, 2005, and amended in December 2009 and October 2013 (the "Revolving Note"). By year end 2015, the Revolving Note carried a balance of $930 million, approximately 43% of CCOH's market capitalization of $2.124 billion. As a consequence of the cash sweep arrangement, CCOH does not manage or control its own excess operating cash.

CCOH fully disclosed the material terms of the Intercompany Agreements in its IPO Prospectus and its Registration Statement (Form S-1/A) filed with the SEC. The Prospectus also disclosed that CCOH could not "terminate these agreements or amend them in a manner [CCOH] deem[s] more favorable so long as [iHC]

7

continues to own shares of [CCOH] common stock representing more than 50% of the total voting power of [CCOH] common stock."[3]

## C.  The iHC Leveraged Buyout

In November 2006, iHC's Board agreed to sell iHC for $18.7 billion, or $37.60 per share, in a leveraged buyout led by a consortium of private equity firms that included the Private Equity Defendants.  The offer price was increased twice and, in September 2007, the iHC stockholders approved the LBO at $39.20 per share.  Before the LBO could close, however, the global financial markets fell into crisis, credit seized up, and the banks that had committed to finance the transaction refused to honor their commitments.  After a lengthy legal battle, the parties settled at a revised buyout price of $36 per share, for a total transaction price of $17.9 billion.  iHC completed its merger with a subsidiary of iHM in July 2008.

As a result of the LBO, iHC took on more than $18 billion in debt, an amount which has since grown to over $20.8 billion.  This debt load quickly led to questions in the market regarding iHC's ability to service its debt obligations.  In May 2009, the New York Post reported that iHC was speaking with lenders about restructuring its debt, including through a pre-packaged bankruptcy.  Rumors of impending bankruptcy made it increasingly difficult, if not impossible, for iHC to

---

[3] Defs.' Opening Br. in Supp. of Their Mot. to Dismiss Pl.s' Verified Stockholder Derivative Compl. ("Defs.' Opening Br.") Ex. 1 ("Prospectus") at 20.

8

issue debt in the public market or through arms-length transactions. This, in turn, caused iHC to depend more heavily upon the cash management sweep arrangement and the Revolving Note with CCOH for cash flow. Indeed, the Revolving Note became iHC's principal source of much needed liquidity. By December 2008, the balance on the Revolving Note had reached $431.6 million. By the end of 2009, the maturity date on the Revolving Note was approaching and iHC still had not restructured its debt obligations from the LBO. This left the CCOH Board with no choice but to extend the term of the Revolving Note to December 2017.

In December 2009, around the same time the term of the Revolving Note was extended, Standard & Poor's downgraded iHC's debt to a "CCC-" rating. Over the next few years, the outstanding balance on the Revolving Note continued to grow. As of the quarter ending March 31, 2012, the balance had reached $702 million.

## D.    The 2012 Litigation

In March 2012, minority stockholders of CCOH filed a derivative complaint challenging the decision by CCOH's Board "to approve the 2009 amendment to the Revolving Note on commercially–unreasonable terms, and seeking relief requiring the Board to demand repayment of all or part of the outstanding balance" (the "2012 Litigation").[4] The plaintiffs in the 2012 Litigation alleged that "the

---

[4] Verified Stockholder Derivative Compl. ("Compl.") ¶ 56.

Board's letting the balance [on the Revolving Note] increase unabated with no practical path to repayment was a breach of its duty of loyalty."[5]

In response to the 2012 complaint, the CCOH Board appointed the SLC, comprised of independent directors, to investigate and take all actions it deemed appropriate to address the claims, including litigation or settlement. The SLC, with the assistance of counsel, conducted its investigation over the ensuing eight months, interviewing more than twenty witnesses and reviewing thousands of documents.

Not surprisingly, the SLC concluded that the Intercompany Agreements very much favored iHC. Nevertheless, the SLC was satisfied that CCOH was bound by the Intercompany Agreements and, by their express terms, could not alter or modify them as long as iHC owned 50% or more of the voting power of CCOH's outstanding common stock. The SLC also determined that any attempt to modify the Corporate Services Agreement could trigger an event of default with respect to iHC's LBO lenders which would leave CCOH exposed under its indemnification obligations to iHC for billions of dollars. Moreover, demanding repayment on the Revolving Note would yield limited benefits since iHC could exercise substantial control over CCOH's use of the funds and all excess cash would simply be swept back to iHC. The SLC thought it best to settle.

---

[5] *Id.*

In June 2013, the parties entered into a Stipulation of Settlement (the "2013 Settlement") which included both a specific release of certain defined claims and a general release. The terms of the 2013 Settlement required the CCOH Board to make an immediate demand that iHC pay $200 million on the Revolving Note and simultaneously declare a $200 million *pro rata* dividend to all CCOH stockholders. The Board also agreed to establish a special committee comprised of three independent directors, the Intercompany Note Committee ("INC"), to monitor the Revolving Note and issue monthly reports on the Revolving Note balance. In addition, the INC is to monitor iHC's liquidity position to determine whether it crosses either of two negotiated triggers. Depending on which of the triggers is implicated, the INC is empowered to demand repayment of some or all of the Revolving Note balance without consequence and to declare a dividend equal to the repayment amount.[6]

The first of the negotiated triggers focuses on the ratio between the Intercompany Note balance and iHC's liquidity. The INC is authorized to demand repayment of the entire balance if and when iHC's cash, cash equivalents and available borrowing, when divided by the amount of the Revolving Note

---

[6] To enable the INC to perform its reporting function, the 2013 Settlement requires iHC to supply monthly and annual reports to the INC and CCOH in which it reports and forecasts the Revolving Note balance and its liquidity position. Defs.' Opening Br. Ex. 8 ("Stipulation of Settlement") at 19–21.

apportionable to public stockholders, is projected to fall below 2.0x during a designated projection period.[7] The second negotiated trigger focuses solely on the size of the Revolving Note. The INC is authorized to demand repayment of a portion of the balance under this trigger if and when the amount of the Revolving Note apportionable to public stockholders is (or is projected to be) in excess of $114 million.

As part of the 2013 Settlement, the parties entered into a specific release of claims that had been asserted in the litigation and a broad release of claims that could have been asserted. Specifically, the derivative plaintiffs released:

> any and all claims that (i) have been asserted in the Derivative Action, or (ii) that could have been asserted in the Derivative Action, or in any other court action or before any court, administrative body, tribunal, arbitration panel, or other adjudicatory body, from the beginning of time through the date of this Stipulation, that are based upon, arise out of, or relate in any way, directly or indirectly, to: (a) the allegations made in, or the subject matter of, the Derivative Action; (b) the matters discussed in [the SLC Findings] filed concurrently with this Stipulation; (c) the issuance by a subsidiary of the Company of the 9.25% Series A Senior Notes Due 2017 and 9.25% Series B Senior Notes Due 2017 and the use of proceeds thereof (including repayment of the $2.5 billion term loan payable by the Company to Clear Channel and the amendment and extension of the Note in connection therewith) including consummation of the issuance in lieu of any other potential transaction considered; (d) the adoption, approval, or

---

[7] Defs.' Opening Br. Ex. 6 ("SLC Brief") at 23. Although not expressly referenced in the Complaint, the Court has considered the entirety of the 2013 Settlement documents for context and completeness. *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016) (the "incorporation-by-reference doctrine permits a court to review the actual document to ensure that the plaintiff has not misrepresented its contents and that any inference the plaintiff seeks to have drawn is a reasonable one.").

amendment of, or the exercise or non-exercise of rights under, the Note; (e) any potential claims relating to the subject matter of the Derivative Action identified by the SLC in the court of its investigation; and/or (f) this Stipulation.[8]

The 2013 Settlement was presented to the Court for approval at a fairness hearing on September 9, 2013. No CCOH stockholder objected. In determining that the settlement was fair and reasonable, then-Chancellor Strine observed that "the pre-IPO arrangements were formidable and it's very difficult to complain about them because they're not the sort of thing that was the subject of a fiduciary negotiation. They were disclosed and people bought into them."[9] The Court also observed that it could not discern "any legal theory that [would allow CCOH] to break" the Intercompany Agreements and that, "given those realities," including "spillover effects" from demanding repayment of the Revolving Note, the forward-looking settlement provisions would provide "substantial benefits on an ongoing basis" to CCOH and its stockholders.[10]

---

[8] Stipulation of Settlement at 14–15, 23–25.

[9] Defs.' Reply Br. in Further Supp. of Their Mot. to Dismiss Pl.s' Verified Stockholder Derivative Compl. ("Defs.' Reply Br.") Ex. 12 ("Settlement H'rg") at 36–37.

[10] *Id.* at 33, 37–38.

### E. iHC's Financial Condition Worsens

The iHeart Defendants' financial condition continued to deteriorate following the 2013 Settlement. iHM reported eleven consecutive quarters of negative net income on a consolidated basis and continued to pay high amounts of yearly interest expense on its expanding debt. Specifically, in 2015, iHM paid $1.74 billion in yearly interest on $20.8 billion of debt. $8.5 billion of this debt will come due in the next three years, with $193 million in notes maturing in 2016 and $8.3 billion of bonds and term loans maturing in 2019. Currently, the iHeart Defendants' public debt trades at about 35% of par while iHM's stock price has fallen from $7.50 per share in June 2015 to $0.95 per share on May 6, 2016. Meanwhile, the balance on the Revolving Note has continued to grow. At the start of the 2012 Litigation, the outstanding balance was approximately $656 million. All quarter-end and year-end balances beginning with the first quarter after the 2013 Settlement have ranged between $875 million and $950 million.

### F. The Note Offering and Asset Sales

Despite the seemingly dire financial condition of its former parent to which it is contractually (and financially) tethered, in early 2015, CCOH was in an acquisitions mode. In February and May 2015, the Board received reports of

particular acquisition opportunities in strategic markets, such as New York City.[11]

By September 2015, in a rather abrupt volte-face, the discussion turned from new acquisitions to potential sales of assets. At a joint meeting of the Boards of CCOH and the iHeart Defendants on September 29, 2015, the directors in attendance discussed selling certain CCOH Latin American businesses and certain United States assets and considered recommendations regarding the retention of financial advisors for the asset sales.[12] At the conclusion of the meeting, CCOH's Board voted to retain Moelis & Company.[13]

In November 2015, the CCOH Board began to discuss the possibility of a debt issuance. At a meeting on November 13, 2015, the Board asked its advisors if CCOH could issue debt through a subsidiary and use the proceeds to fund a *pro rata* dividend.[14] Later that month, at a November 30, 2015 Board meeting, the Board discussed the ramifications of an iHM bankruptcy.[15] Based on projections, iHM would not have sufficient cash flow to pay its debts beginning in the first

---

[11] Compl. ¶ 75 (quoting Compl. Ex. A, CCOH 2015 Management Update at CCOH001066); Compl. Ex. B (May 13, 2015 Meeting Minutes).

[12] Compl. Ex. C (Sept. 29, 2015 Meeting Minutes).

[13] *Id.*

[14] Compl. Ex. E (Nov. 13, 2015 Meeting Minutes).

[15] Compl. Ex. F (Nov. 30, 2015 Meeting Minutes).

15

quarter of 2017.[16] If CCOH undertook a debt issuance and the asset sales, however, the resulting distributions to iHC would allow iHM to service its debt through all of 2017.[17]

On December 16, 2015, the Board announced that, through its indirect wholly owned subsidiary, Clear Channel International B.V., CCOH would issue $225 million in 8.75% Senior Notes maturing in 2020 through which the subsidiary would receive $217.8 million in net proceeds (the "Note Offering"). On December 20, 2015, the Board declared a special cash dividend for the entire $217.8 million, payable *pro rata* to holders of all Class A and Class B common stock as of the record date of January 4, 2016 (the "January Dividend"). GAMCO alleges that in approving the Note Offering, the CCOH Board caused CCOH to "incur needless interest expense" at an "over-market 8.75% interest rate" and "worsen [its] credit profile," all for the sake of infusing the iHeart Defendants with cash to address their acute liquidity need.[18]

In the first quarter of 2016, CCOH sold assets in eight strategic United States markets in a series of transactions that generated $602 million in cash (the "Asset Sales"). The Asset Sales were approved at Board meetings on

---

[16] *Id.*

[17] *Id.*

[18] Compl. ¶¶ 85–89.

December 23, 2015 and January 4, 2016.[19] CCOH's financial advisors reported to the Board that "a strong and fair process had been run, that such process had led to serious engagement from all likely parties, and that the strong process [resulted in] strong OIBDAN valuation multiples."[20]

At its next meeting, on January 21, 2016, the CCOH Board considered whether to dividend the proceeds from the Asset Sales and whether to demand a repayment of a portion of the Revolving Note to fund a portion of a special dividend. At the conclusion of the meeting, the Board notified iHC that it would demand repayment of $300 million of the more than $990 million outstanding on the Revolving Note effective February 4, 2016. At the same time, the Board declared special cash dividends payable on February 4, 2016 to all Class A and Class B stockholders of record in an aggregate amount equal to $540 million, using proceeds from both the repayment demand and the Asset Sales (the "February Dividend"). The February Dividend was paid to stockholders of record as of February 1, 2016.

GAMCO alleges that in approving the Asset Sales the CCOH Board "divested assets at suboptimal prices" on a "timetable" that benefited only the

_____

[19] Compl. Ex. G (Dec. 23, 2015 Meeting Minutes); Compl. Ex. H (Jan. 4, 2016 Meeting Minutes).

[20] Compl. Ex. G (Dec. 23, 2015 Meeting Minutes) at CCOH000695; Compl. Ex. H (Jan. 4, 2016 Meeting Minutes) at CCOH000848.

iHeart Defendants.[21]  As to one of the transactions, the Lamar Asset Sale, the Complaint alleges that CCOH agreed to reduce the purchase price on the assets by $1.5 million in order to accelerate the transaction and get cash to the iHeart Defendants more quickly.

### G.   GAMCO Initiates This Litigation

GAMCO filed its Complaint on May 9, 2016, after receiving books and records pursuant to its demand under 8 *Del. C.* § 220.  The Complaint contains five counts: Count I (breach of fiduciary duty against the iHeart Defendants and the Private Equity Defendants as controlling stockholders relating to the Revolving Note, the Intercompany Agreements, the Note Offering and the Asset Sales); Count II (breach of fiduciary duty against the members of the CCOH Board relating to the Revolving Note, the Intercompany Agreements, the Note Offering and the Asset Sales); Count III (aiding and abetting breaches of fiduciary duties against the iHeart Defendants and Private Equity Defendants); Count IV (unjust enrichment against the iHeart Defendants and the Private Equity Defendants related to the Note Offering and Asset Sales); and Count V (waste of corporate assets against the members of the CCOH Board, the iHeart Defendants and the Private Equity Defendants related to the Revolving Note, the Intercompany Agreements, the Note Offering and the Asset Sales).

---

[21] Compl. ¶¶ 5, 72, 100.

## II. LEGAL ANALYSIS

### A. Motion to Dismiss Standard

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[22] Under this standard, the Court will deny the motion if the plaintiff has pled a reasonably conceivable cause of action.[23] All well-pled allegations in the complaint will be regarded as true but the Court need not accept conclusory allegations that lack any factual basis.[24]

### B. The Breach of Fiduciary Duty Claims Related to the Revolving Note Are Barred by the 2013 Settlement

GAMCO argues that the 2013 Settlement does not bar its claims relating to the Revolving Note for three reasons. *First*, by its express terms, the 2013 Settlement releases only claims accruing up to the date of the stipulation and release. *Second*, the claims asserted here are distinct from the claims asserted in the 2012 Litigation both temporally and substantively. *Third*, even if the 2013 Settlement was intended to be "forward looking," Delaware law is well-settled that parties cannot relieve a fiduciary from complying with its fiduciary duties by contract. For the reasons that follow, I conclude that these arguments lack merit

---

[22] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[23] *Id.*

[24] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011); *Criden v. Steinberg*, 2000 WL 354390, at *1 (Del. Ch. Mar. 23, 2000).

19

and that Counts I and II as they relate to the Revolving Note and Intercompany Agreements must be dismissed.

### 1.    The Scope of the 2013 Settlement

According to GAMCO, Defendants' attempt to invoke the 2013 Settlement as a basis to bar GAMCO's claims relating to the Revolving Note "ignores the stipulation's express limitation that 'Released Plaintiff Claims' included only claims 'from the beginning of time through the date of this Stipulation.'"[25] The Complaint alleges that even after the 2013 Settlement CCOH continues to funnel money to iHC while the financial fitness of all iHeart entities continues to deteriorate, making it all the more likely that iHC will default on its substantial contractual obligations to CCOH. Since the Complaint pleads facts relating to events that post-date the 2013 Settlement, GAMCO argues that the claims arising from those facts could not have been released.

"[A]n effective release terminates the rights of the party executing and delivering the release and . . . is a bar to recovery on the claim released."[26] "When determining whether a release covers a claim, 'the intent of the parties as to its scope and effect are controlling, and the court will attempt to ascertain their intent

---

[25] Pl.s' Answering Br. in Opp'n to Defs.' Mot. to Dismiss the Verified Stockholder Derivative Compl. ("Pl.s' Answering Br.") 20 (citing Stipulation of Settlement at 14–15).

[26] *Seven Inv., LLC v. AD Capital, LLC*, 32 A.3d 391, 396 (Del. Ch. 2011) (quoting *Hicks v. Soroka*, 188 A.2d 133, 138 (Del. Super. Ct. 1963)).

from the overall language of the document.'"[27] "Delaware courts recognize the validity of general releases,"[28] and acknowledge that they are "intended to cover everything – what the parties presently have in mind, as well as what they do not have in mind."[29] And "[i]f [a subsequent] claim falls within the plain language of [a] release, then the claim should be dismissed."[30]

The release the parties entered in connection with the 2013 Settlement released "any and all claims that (i) have been asserted in the Derivative Action, or (ii) that could have been asserted in the Derivative Action . . . that are based upon, arise out of, or relate in any way, directly or indirectly, to . . . (a) the allegations made in, or the subject matter of the [2012 Litigation]; (b) the matters discussed in the [SLC's investigation]; (c) . . . the amendment and extension of the [Revolving Note] . . .; [and] (d) adoption, approval, or amendment of, or on the exercise or non-exercise of rights under, the [Revolving Note]."[31] The release language reflects an intent to give both a specific release and the quintessential general

---

[27] *Id.*

[28] *Deuly v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1163 (Del. 2010), *cert. denied*, 563 U.S. 938 (2011).

[29] *Corp. Prop. Assocs. 6 v. Hallwood Gp., Inc.*, 817 A.2d 777, 779 (Del. 2003) (quoting *Adams v. Jankouskas*, 452 A.2d 148, 156 (Del. 1982)).

[30] *Id.*

[31] Stipulation of Settlement at 14–15.

21

release.[32] And while GAMCO is correct that many of the facts on which it bases its claims relating to the Revolving Note occurred after the 2013 Settlement, it misses the point when it argues that this temporal separation alone allows its current claims to survive the extinguishing effects of the release entered in 2013.

In Delaware, the settlement of representative litigation "can release claims that were not specifically asserted in the settled action . . . if those claims are 'based on the same identical factual predicate or the same set of operative facts' as the underlying action."[33] The operative facts supporting GAMCO's claims relating to the Revolving Note are that iHC is significantly burdened with debt and on the brink of default, that iHC uses CCOH as its primary source of liquidity and that CCOH has done nothing to demand repayment.[34] To the extent these same or similar operative facts were asserted to support the same or similar claims in the 2012 Litigation, the broad release of these claims in 2013 would bar GAMCO from reasserting them here. As discussed below, a comparison of the two operative complaints reveals that GAMCO's claims relating to the Intercompany

---

[32] *See Corp. Prop. Assocs. 6*, 817 A.2d at 779 (discussing language utilized by the parties to reflect their intent to create a general release of claims).

[33] *In re Phila. Stock Exch., Inc.*, 945 A.2d 1123, 1146–47 (Del. 2008); *see also Deuly*, 8 A.3d at 1164 (affirming Rule 12(b)(6) dismissal of claims deemed to be barred by settlement release); *Metro. Life Ins. Co. v. Tremont Gp. Hldgs., Inc.*, 2012 WL 6632681, at *10–13 (Del. Ch. Dec. 20, 2012) (dismissing derivative claims upon concluding they were barred by prior settlement).

[34] Compl. ¶¶ 3, 9, 11.

22

Agreements were prosecuted in the 2012 Litigation and released in the 2013 Settlement.[35]

### 2. CCOH Released the Claims Regarding the Intercompany Agreements Set Forth in the Complaint

GAMCO alleges in its Complaint that the 2012 Litigation was brought to challenge the CCOH Board's decision to approve the 2009 amendment to the Revolving Note on commercially-unreasonable terms "and [to seek] relief requiring the Board to demand repayment of all or part of the outstanding balance."[36] Although not pled in its Complaint, GAMCO contends in its Answering Brief that plaintiffs in the 2012 Litigation sought to force the Board to "break" the Intercompany Agreements or to hold the Board liable for failing to terminate the Intercompany Agreements.[37] While plaintiffs certainly advanced these two themes in the 2012 Litigation, the claims asserted then and resolved in the 2013 Settlement were much broader. The following chart, taken largely from the chart submitted with the Defendants' Opening Brief, lines up the allegations made in the 2012 Litigation with GAMCO's allegations here:

---

[35] Defs. Opening Br. Ex. 5 ("2012 Compl.") at ¶¶ 1–5, 7.

[36] Compl. ¶ 56.

[37] Pl.s' Answering Br. 22. The fact that this description of the 2012 Litigation appears for the first time in GAMCO's Answering Brief reveals GAMCO's attempt to adjust its characterization of the 2012 Litigation to meet the Defendants' release argument.

23

| 2012 Litigation Allegations | GAMCO's Allegations |
|---|---|
| ¶ 1 – "This derivative lawsuit arises from the decision by [CCOH's] controlling shareholder, [iHC], to compel the Individual Defendants to approve a $1.0 billion unsecured loan . . . by [CCOH] to [iHC] on terms so incredibly favorable to [iHC] that no rational third-party would have ever agreed to lend money on such terms. . . . [CCOH] faces a severe risk that the unsecured loan will never be paid back because [iHC] has been drowning under a massive debt load since its 2008 leveraged buyout." | ¶ 1 – "This derivative action arises because CCOH's Board refuses to untangle the Company from [Intercompany Agreements] with its majority owner iHC . . . that are materially deleterious to the current and future performance of CCOH. The Intercompany Agreements act as an anchor dragging down CCOH for the benefit of the iHeart and Private Equity Defendants." |
| ¶ 3 – "In 2008, Bain Capital Partners, LLC . . . and Thomas H. Lee Partners, L.P. . . . took [iHC] private in a $24 billion leveraged buyout. The Buyout saddled [iHC] with more than $18 billion in debt. This debilitating debt load has caused concern that [iHC] could default on its obligations and [iHC]is currently at risk of going into bankruptcy. Doubts about [iHC's] financial health have made it extremely difficult for [iHC] to raise capital."<br><br>¶ 4 – "Bain and THL [have] forc[ed] [CCOH] and its public shareholders to become an involuntary source of capital."<br><br>¶ 5 – "To provide much needed liquidity, [iHC] has abused its position as controlling shareholder of [CCOH]." | ¶ 3 – "While the cash management arrangement was never intended to be a financing source for CCOH's parents, iHC and iHM, the [Intercompany Note] balance has increased as the iHeart Defendants' financial health has deteriorated. Virtually all or a sizable portion of the cash swept from the Company is used for iHC's day-to-day operations or to prop up the iHeart Defendants' unsustainable capital structure, which is mired in $20.8 billion in debt. To date, the iHeart Defendants have managed to service the suffocating debt, but they continue to sustain hundreds of millions in losses each year and face billions of dollars in maturing debt that they have little, if any, prospect of repaying or refinancing." |

| 2012 Litigation Allegations | GAMCO's Allegations |
|---|---|
| ¶ 7 – "In late 2011, one of [CCOH's] shareholders questioned the Board regarding the propriety of the [Intercompany Note]. Instead of conducting a legitimate review of the [Note], the Board told the shareholder that the Company could not unilaterally modify or eliminate the contractual obligations under the [Note]. The Board's response is simply untrue. The [Note] is payable on demand and if the Board was concerned with the public shareholders' best interest, the Board would demand immediate repayment."<br><br>¶ 61 – "During the week of February 27, 2012, the Committee sent a letter to JHL informing JHL that the Committee's review of the Loan had not revealed a way that [CCOH] could unilaterally modify or eliminate the contractual commitment. The Committee's response is simply wrong and emphasizes that the Board's loyalty lies with [iHC] and not the [CCOH's] public shareholders."<br><br>¶ 63 – "In its letter to JHL, the Committee ignores the fact that [CCOH] could demand repayment of the [Note] by [iHC] at any time. However, because demanding immediate repayment could be damaging to Bain and THL's multi-billion dollar investment in [iHC], the [CCOH] Board has not taken such action, even though doing so is necessary to protect the interests of the [CCOH's] public shareholders." | ¶ 8 – "[T]he Board . . . permits CCOH to be used as a liquidity source for the iHeart Defendants in wholesale derogation of their fiduciary duties."<br><br>¶ 9 – The Board "refus[es] to extricate CCOHH from the agreements."<br><br>¶ 13 – "Any director acting in good faith and solely in the interests of CCOH and its minority shareholders would: (i) seek to terminate the cash management arrangement and normalize CCOH's administrative and operating structure to shield the Company from its exposure to the iHC and the iHeart Defendants' unsustainable capital structure; (ii) take all actions necessary to stop dollars from being diverted from CCOH that should properly be invested in the Company's own growth and opportunity; and (iii) conclude that the [Intercompany Note] balance should have been and has to be reduced or eliminated."<br><br>¶ 110 – "CCOH's future viability as a public company and achieving maximum value for its stockholders plainly requires the Board to extricate the Company from the restrictions that iHC and the other Defendants have placed on it. The Board must normalize the administrative and operational structure and reduce operational risk by severing the administrative relationships with the iHeart Defendants whose unsustainable debt structure puts CCOH at significant operational and fiscal risk." |

25

| 2012 Litigation Allegations | GAMCO's Allegations |
|---|---|
| ¶ 54 – "Further, because [iHC] takes all of Outdoor's cash on a daily basis, it prevents Outdoor from utilizing that cash to make alternative investments. In essence, therefore, the 'cash management program' not only compels Outdoor to serve as an unsecured creditor of [iHC] with no control over its own finances, but also makes [iHC] Outdoor's only cash investment rendering any sort of responsible diversification impossible."

¶ 73 – "[T]he [Intercompany Note] provides no benefit to [CCOH] and could have catastrophic effects on [CCOH] in the event [iHC] declares for bankruptcy."

¶ 86 – "As a result of the actions of the Individual Defendants described herein, the Company has been deprived tens of millions of dollars in interest payments and risks being forever deprived of being repaid the principal on the borrowings under the [Revolving Note]." | ¶ 4 – "The Intercompany Agreements remain in place solely for the benefit of Defendants and serve no rational business purpose for CCOH."

¶ 5 – "[T]he Intercompany Agreements and CCOH's lack of autonomy over its own cash have" prevented CCOH from "making acquisitions" and "investing its capital."

¶ 40 – "iHC's dominion over CCOH restricts [CCOH] from exploring its own favorable business opportunities."

¶ 62 – Alleging the Board has a "continuing and unremitting obligation to attempt[] to free the Company from its demonstrably harmful agreements with iHC to permit it to explore autonomous business and growth opportunities."

¶ 111 – "If the Board were acting solely for the Company, it would seek to sever the lending relationship to help stabilize the CCOH financial and capital structure and to eliminate the risk of the iHeart Defendants' dominion over $640 million (historically closer to $1 billion) in CCOH's cash. Doing so would enable CCOH to deploy that capital to grow the business or to use it in connection with transactions that help unlock value." |

26

| 2012 Litigation Allegations | GAMCO's Allegations |
|---|---|
| ¶ 85 – "The Individual Defendants have breached their duty of loyalty by approving the Amended [Revolving Note] which elevates the interests of [iHC] over the interests of [CCOH] and the Company's public shareholders."<br><br>¶ 95 – "Plaintiff prays for judgment and relief as follows: . . . Rescinding the [Intercompany Note], and terminating the cash management arrangement." | ¶¶ 137–38 – "The Board Defendants have breached their duty of loyalty by elevating and favoring the interests of iHM, iHC, and the Private Equity Defendants over the interests of CCOH and its minority stockholders, including by causing the Company, or directing the Board Defendants to cause the Company to, among other things: (i) continually loan iHC cash under the [Intercompany] Note at commercially-irrational rates. . . ."<br><br>¶56 – "Then [in 2012], as now, the Board's letting the balance increase unabated with no practical path to repayment was a breach of its duty of loyalty."<br><br>¶58 – "Plaintiffs in the 2012 Litigation also alleged that CCOH's Board breached its duties by refusing to demand repayment on the note and allowing the amounts owed to escalate." |

Tellingly, GAMCO's lead-off allegation is that "CCOH's Board refuses to untangle [CCOH] from intercompany agreements . . . that are materially deleterious to the current and future performance of CCOH."[38] The Complaint goes on to recite facts, almost all of which model the allegations made by the derivative plaintiffs in 2012, to support GAMCO's claims that the CCOH Board is

---

[38] Compl. ¶ 1. *Compare* 2012 Compl. ¶ 1 (alleging that the CCOH Board committed CCOH to an unsecured loan (the Revolving Note) that placed CCOH at "severe risk" that the loan "will never be paid back").

acting disloyally to CCOH's stockholders by continuing to abide by the Intercompany Agreements, especially the Revolving Note. As the comparison of the complaints reveals, the plaintiffs in 2012 also cited the increasing size of the Revolving Note and iHC's increasing reliance on the Revolving Note as bases to contend that the CCOH Board breached its fiduciary duties by continuing to honor the Revolving Note and that the Board should "demand immediate repayment."[39]

GAMCO argues that the operative facts supporting its claims here are distinct from those litigated and released in the 2013 Settlement since the ever-increasing balance on the Revolving Note and the ever-worsening state of iHC's financial fitness occurred after the 2013 Settlement. But the reality is that the parties to the 2013 Settlement knew full well that the balance of the Revolving Note was going to continue to grow long after the parties agreed to a broad release of claims.[40] This is precisely why the 2013 Settlement approved by the Court included forward-looking liquidity triggers designed to address the concern that the Revolving Note balance might continue to grow and iHC's financial condition might continue to deteriorate to degrees that would require CCOH to demand repayment of the Revolving Note. GAMCO has not alleged that either of these

---

[39] *Compare* 2012 Compl. ¶¶ 3, 7; 54, *with* Compl. ¶¶ 1-3, 56-58, 63–67.

[40] Settlement Hr'g at 12–13; Stipulation of Settlement at 3 ("[CCOH] anticipates that the balance on the [Revolving Note] will increase to over $1.0 billion in the next few years . . ."); 2012 Compl. ¶ 5 ("[CCOH] has publicly disclosed that it expects the size of the [Revolving Note] to balloon over $1 billion in the next few years.").

triggers has been pulled or that the INC or CCOH Board have somehow failed to comply with their monitoring and reporting obligations under the 2013 Settlement. The growing Revolving Note balance and the worsening financial condition of iHC are extensions of the same operative facts that were the foundation of the plaintiff's claims in 2012 and at the heart of the 2013 Settlement.

Under GAMCO's view of the 2013 Settlement, and its construction of Delaware's "operative facts" test for determining the scope of releases, any CCOH stockholder could have initiated derivative litigation against the CCOH Board to challenge the Board's ongoing commitment to the Intercompany Agreements before the ink was even dry on the 2013 Settlement based on the logic that iHC's financial condition had continued to worsen, the balance of the Revolving Note had continued to grow, and the CCOH Board had continued to abide by the terms of the Intercompany Agreements and the 2013 Settlement to the detriment of CCOH shareholders. This construction of the 2013 Settlement and Delaware release law would render the 2013 Settlement a practical nullity. It would also be contrary to the intent of the parties to the 2013 Settlement with regard to the "scope and effect" of the release and would disrupt the "global peace" they sought to achieve.[41]

---

[41] *See Seven Inv., LLC*, 32 A.3d at 396; *In re Countrywide Corp. S'holders Litig.*, 2009 WL 846019, at *10 (Del. Ch. Mar. 31, 2009) (noting that "settlement often is not possible

### 3. GAMCO Has Not Pled an Actionable Breach of Fiduciary Duty Claim With Respect to the Intercompany Agreements

As noted, GAMCO has not alleged that iHC is in default on the Revolving Note or that the INC or the CCOH Board have failed to implement or honor the forward-looking elements of the 2013 Settlement. Instead, they contend that even if iHC is not in default, even if the CCOH Board has complied with the 2013 Settlement, and even if the specific language of the release could be interpreted to encompass the claims it has asserted here, the CCOH Board must still be held to answer for its failure to call the Revolving Note because it is well-settled under Delaware law that corporate fiduciaries cannot secure a contractual release that purports to allow them to avoid their fiduciary duties.[42] GAMCO points out that the parties to the 2013 Settlement made clear to the Court during the fairness hearing that nothing in the settlement would relieve the CCOH Board of its ongoing fiduciary duties.[43] With this in mind, GAMCO argues the CCOH Board

---

without granting such 'global peace'"). *See also Phila. Stock Exch.*, 945 A.2d at 1137 (noting that general releases are designed to provide "complete peace").

[42] Pl.s' Answering Br. 18 (citing *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 51 (Del. 1993)).

[43] Settlement Hr'g at 24 ("You always have to be mindful of your fiduciary duties.").

should be even more conscious of its fiduciary duties because the 2013 Settlement put the Board on notice of its ongoing duty to monitor the Revolving Note.[44]

GAMCO is correct that, in Delaware, corporate fiduciaries cannot contract around fiduciary duties.[45] But this settled principle of Delaware law cannot take GAMCO where it wants to go. To understand why, it is helpful to focus again on precisely what the CCOH Board was confronting in 2013 with respect to the Intercompany Agreements, and what it has been confronting ever since.

As noted by the SLC when investigating the claims made in the 2012 Litigation, the Intercompany Agreements placed CCOH in a position where (1) it could not terminate or renegotiate the agreements because iHC and its affiliates beneficially owned more than 50% of the voting power of CCOH common stock; (2) it could not breach the agreements because it was obligated to indemnify iHC if it caused iHC to breach its credit agreements with lenders (a potential liability of billions of dollars); (3) it could not freely use any of the proceeds it might recover if it attempted to call the Revolving Note because iHC had the right to pre-approve any significant asset acquisition or sale; and (4) it could not sit on the cash it

---

[44] Compl. ¶ 62 ("The 2012 Litigation plainly put each of the Board Defendants on notice of the unreasonableness of allowing iHC to increase the Revolving Note balance without limit or regard for the effect on CCOH. It also reminded each Board Defendant of their independent and constant, continuing and unremitting obligation to consider CCOH's interests . . .").

[45] *Paramount Commc'ns Inc.*, 637 A.2d at 51.

received upon calling the Revolving Note while it assessed how best to deploy that cash because any funds in excess of amounts required to satisfy accounts payable and make payroll would have to be swept back to iHC the same day they landed in CCOH's accounts.[46] Indeed, at the fairness hearing in 2013, then-Chancellor Strine described the Intercompany Agreements as "formidable" and observed that he could conceive of no "legal theory that was going to allow [CCOH] to break" them.[47]

Given the corner into which the Intercompany Agreements have painted the CCOH Board, there is no reasonably conceivable basis upon which GAMCO can establish that the Board has breached its fiduciary duty by adhering to the carefully-negotiated governance and monitoring provisions agreed to in the 2013 Settlement.[48] Requiring the Board to do anything more under the factual

---

[46] Defs.' Opening Br. Ex. 7 ("SLC Findings") at 1–2, 4; Prospectus at 61–62. *See Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995), *aff'd*, 672 A.2d 35 (Del. 1996) (controlling stockholder "not required to give up legal rights that it clearly possesses.").

[47] Settlement H'rg at 36–37.

[48] Nor can GAMCO state a viable breach of fiduciary duty claim against the iHeart Defendants as controllers. Delaware law is clear that a controller is free to exercise its bargained-for contractual rights without breaching its fiduciary duties, even when doing so might be to the detriment of the stockholders to whom the duties are owed. *See In re CNX Gas Corp. S'holders Litig.*, 2010 WL 2291842, at *9 (Del. Ch. May 25, 2010). *See also Getty Oil Co. v. Skelly Oil Co.*, 267 A.2d 883, 888 (Del. 1970) ("[T]he duty [of parent to its subsidiary] does not require self-sacrifice from the parent"); *Odyssey P'rs, L.P. v. Fleming Cos., Inc.*, 735 A.2d 386, 411 (Del. Ch. 1999) (holding that controlling stockholder was under no fiduciary obligation to agree to a proposal that would have "required significant and disproportionate self-sacrifice").

circumstances pled in the Complaint would be a futile gesture and the Complaint pleads no facts that would suggest otherwise. "Equity ought not to attempt futile acts."[49] Stated differently, our law does not require corporate boards to engage in pointless exercises, much less those that pose a serious risk of substantial harm to the company and its stockholders.[50] While circumstances may arise that would require the CCOH Board, in the proper exercise of its fiduciary duties, to demand repayment of the Revolving Note even absent one of the liquidity triggers being reached, GAMCO has not alleged the presence of those circumstances in the Complaint.

## C. The Breach of Fiduciary Duty Claim Related to the Revolving Note Is Barred by *Res Judicata*

Even if the Complaint was not barred by the 2013 Settlement, GAMCO has failed to plead facts that would allow it to overcome the preclusive effects of *res judicata*. As our Supreme Court has explained, "the doctrine of *res judicata* serves to prevent a multiplicity of needless litigation of issues by limiting parties to one fair trial of an issue or cause of action which has been raised or should have been

---

[49] *Freedman v. Rest. Assoc. Indus., Inc.*, 1987 WL 14323, at *9 (Del. Ch. Oct. 16, 1987) (Allen, C.).

[50] *See Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 (Del. 1987); *McMullin v. Beran*, 765 A.2d 910, 920 (Del. 2000). *See also In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *6 (Del. Ch. Sept. 27, 2013) (dismissing breach of fiduciary duty claim where contract prohibited actions plaintiffs claimed directors should take); *Hokanson v. Petty*, 2008 WL 5169633, at *6 (Del. Ch. Dec. 10, 2008) (same).

raised in a court of competent jurisdiction."[51] "*Res judicata* operates to bar a claim where the following five-part test is satisfied: (1) the original court had jurisdiction over the subject matter and the parties; (2) the parties to the original action were the same as those parties, or in privity, in the case at bar; (3) the original cause of action or the issues decided was the same as the case at bar; (4) the issues in the prior action must have been decided adversely to the [party] in the case at bar; and (5) the decree in the prior action was a final decree."[52]

This Court clearly had jurisdiction to resolve the 2012 Litigation. CCOH was the real party in interest in that action and is the real party in interest in this action.[53] Plaintiffs in the 2012 Litigation did not prevail on most of their claims and the matter ultimately was resolved with a final decree of dismissal after the 2013 Settlement was approved.[54] These points are not disputed. Accordingly,

---

[51] *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 192 (Del. 2009) (quoting *Taylor v. Desmond*, 1990 WL 18366, at *2 (Del. Super. Ct. Jan. 25), *aff'd*, 1990 WL 168243 (Del. Aug. 31, 1990) (holding that the doctrine bars "all issues which might have been raised and decided in the first suit as well as to all issues that actually were decided.").

[52] *Id.* (quoting *Dover Historical Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1092 (Del 2000)).

[53] *See Cantor v. Sachs*, 162 A. 73, 76 (Del. Ch. 1932) (holding that the corporation is the party in interest in a stockholder derivative suit).

[54] *See Sternberg v. O'Neil*, 1989 WL 137932, at *4 (Del. Ch. Nov. 9, 1989) ("Since the order approving the settlement is a final judgment, it is *res judicata*."); *Monohan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 289 (2d Cir. 2000) (holding that prior settlement between parties entitled to *res judicata* effect because otherwise "[t]he efficiencies created by a mutually agreeable settlement would be lost.").

only the third element of *res judicata* (the similarity of the causes of action or issues) is relevant here.

Delaware courts will find an identity of issues for *res judicata* purposes when "the same transaction formed the basis for both the present and former suits" and the plaintiff "'neglected or failed to assert claims which in fairness should have been asserted in the first action.'"[55] To resist a finding that resolution of the 2012 Litigation is *res judicata*, GAMCO restates most of the same points it raised in response to the Defendants' release argument. The core of its *res judicata* argument is that "the same transactions did not form the basis for Plaintiff's claims [in the Complaint] and those in the 2012 Litigation."[56] According to GAMCO, the plaintiffs in the 2012 Litigation sought "to force the Board to '*break*' the Intercompany Agreements or hold the Board liable for failing to terminate the Intercompany Agreements,"[57] as well as to challenge a 2009 amendment to the Revolving Note while, in this case, GAMCO attempts "to hold the Board

---

[55] *LaPoint*, 970 A.2d at 193–194 (citing *Kossol v. Ashton Condo. Ass'n, Inc.*, 1994 WL 10861, at *2 (Del. Jan. 6, 1994)).

[56] Pl.s' Answering Br. 22.

[57] *Id.* (emphasis added). Of course, as noted, several paragraphs of the Complaint take the CCOH Board to task for "[refusing] to untangle [CCOH] from the intercompany agreements. . . ."; "[refusing] to extricate CCOH from the agreements. . ."; "[failing] to attempt to terminate the Company's participation in the Intercompany Agreements . . ."; "[not seeking] to terminate the cash management arrangement . . ."; and "[not attempting] to terminate the cash-management sweep arrangement or other Intercompany Agreements." Compl. ¶¶ 1, 9, 11, 13, 61.

accountable for refusing to take any steps to protect CCOH from the iHeart Defendants' and their worsening financial crisis [*by demanding repayment*]. . . ."[58] GAMCO reiterates that because the events set forth in the Complaint occurred after the 2013 Settlement, "[t]hose facts were not, and could not have been, known to plaintiffs in the second action at the time of the first action."[59]

GAMCO's *res judicata* argument reads a bit like alternative history and does not square with its own description of the 2012 Litigation in its Complaint. While GAMCO now argues that the 2012 Litigation was about forcing the CCOH Board to terminate the Intercompany Agreements (a theme it replays in its Complaint), and about challenging the decision by the CCOH Board to approve a 2009 amendment to the Revolving Note,[60] its Complaint actually acknowledges the claims in the 2012 Litigation that sought to hold the CCOH Board accountable for refusing to take any steps to protect CCOH from the iHeart Defendants' worsening financial crisis.[61]

---

[58] *Id.*

[59] *LaPoint*, 970 A.2d at 195.

[60] Pl.s' Answering Br. 22 ("Unlike the plaintiffs in the 2012 Litigation, Plaintiff here does not seek to force the Board to 'break' the Intercompany Agreements or hold the Board liable for failing to terminate the Intercompany Agreements."); Pl.s' Answering Br. 7 ("The 2012 Litigation challenged the decision by CCOH's Board to approve the 2009 amendment to the Revolving Note on terms alleged to be commercially-unreasonable.").

[61] *See* Compl. ¶ 56 ("Then, as now, the Board's letting the balance increase unabated with no practical path to repayment was a breach of its duty of loyalty."); Compl. ¶ 58

To rehash, the fact that the balance on the Revolving Note was going to increase was well known to the parties and the Court when the 2013 Settlement was presented for approval, as was the fact that the iHeart Defendants' financial fitness may well continue to worsen. Indeed, these facts animated the forward-looking provisions of the 2013 Settlement agreements and were important to the Court's determination that CCOH was securing meaningful benefits from the settlement. In light of this glaring reality in 2013, GAMCO's effort to characterize the 2012 Litigation as a controversy that pre-dated a steadily-increasing Revolving Note balance and a steadily-worsening iHC financial condition is simply not credible. The fact that the predictions have materialized—the Revolving Note balance has increased and iHC's financial condition has worsened—reflects a continuation of the "common nucleus of operative facts" that were at the heart of the 2012 Litigation, not a separate transaction for purposes of *res judicata*.[62] Consequently, GAMCO's claims regarding the Revolving Note and Intercompany Agreements (Counts I & II) are barred by *res judicata*.

---

("Plaintiffs in the 2012 Litigation also alleged that CCOH's Board breached its duties by refusing to demand repayment on the note and allowing the amounts owed to escalate.").

[62] *LaPoint*, 970 A.2d at 194 (citing *Maldonado v. Flynn*, 417 A.2d 378, 383 (Del. Ch. 1980)).

**D.** **GAMCO Has Failed to State a Breach of Fiduciary Duty Claim Related to the Note Offering and Asset Sales**

GAMCO alleges that the CCOH Board, iHeart Defendants and the Private Equity Defendants as controllers have breached their fiduciary duties to the minority stockholders by "caus[ing] [CCOH] to sell valuable assets and incur interest expense on new debt in order to prop up the iHeart Defendants' overleveraged and unsustainable capital structure."[63] These transactions, it is alleged, "demonstrate commercially-unreasonable stripping of value from CCOH for Defendants' benefit [and] constitute serious breaches of fiduciary duty."[64] Defendants have moved to dismiss these claims because the sale of non-core assets and the incurrence of debt were arms-length transactions with third-parties that resulted in *pro rata* distributions of dividends to all CCOH stockholders, including GAMCO. This dynamic, according to Defendants, is "fatal to [GAMCO's] claim."[65]

It is well-settled that "Delaware law imposes fiduciary duties on those who effectively control a corporation."[66] iHC, as holder of approximately 90% of CCOH's outstanding shares and 99% of the stockholder voting power is, by any

---

[63] Compl. ¶ 1.

[64] *Id.*

[65] Defs.' Opening Br. 38.

[66] *Quadrant Structured Prods. Co., LTD. v. Vertin*, 102 A.3d 155, 183–184 (Del. Ch. 2014).

measure, the controlling stockholder of CCOH. iHC is wholly owned by iHM. The Private Equity Defendants own 67% of iHMs stock and hold the power to appoint all but two of iHC's directors as well as all of its senior management. On these facts, it is not contested that the iHeart Defendants and the Private Equity Defendants owe fiduciary duties to the minority stockholders by virtue of their position as controllers of CCOH.[67]

GAMCO contends that the CCOH Board's approval of the challenged transactions must be reviewed for entire fairness because both the Asset Sales and Note Offering were undertaken for the sole purpose of benefitting the controlling stockholder and its affiliates by addressing their unique and acute liquidity needs at the expense of the other GAMCO stockholders. In response, Defendants invoke the seminal *Sinclair Oil Corp. v. Levien*[68] to argue that the mere fact the challenged transactions benefited the iHeart Defendants and Private Equity Defendants as controllers is not a basis to strip the CCOH Board of the cloak of the business judgment rule when all CCOH stockholders received *pro rata* benefits. As is often the case, the threshold determination of the appropriate standard of review by which the Defendants' conduct must be measured will be dispositive of the motion to dismiss GAMCO's breach of fiduciary duty claim.

---

[67] Because the Defendants have not disputed this point for purposes of this Motion, I have assumed it to be correct for purposes of my analysis.

[68] 280 A.2d 717 (Del. 1971).

### 1. The Standard of Review in the Controlling Stockholder Context

"Delaware's default standard of review is the business judgment rule" which is "a principle of non-review that 'reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation.'"[69] Entire fairness, on the other hand, is the most "onerous" standard of review under Delaware law.[70] In the controlling stockholder context, the entire fairness standard imposes upon the defendants "the burden of proving that the transaction . . . was entirely fair to the minority."[71] Entire fairness, however, "is not implicated solely because a company has a controlling stockholder."[72] Rather, entire fairness will govern only when "the controller . . . engage[s] in a conflicted transaction."[73]

---

[69] *Quadrant*, 102 A.3d at 183 (citing *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at \*6 (Del. Ch. July 24, 2009)). *See also Williams v. Geier*, 671 A.2d 1368, 1371 (Del. 1996) (holding that directors are presumed to have acted "independently, with due care, in good faith and in the honest belief that [their] actions were in the stockholders' best interests").

[70] *In re Trados Inc. S'holders Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013).

[71] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012) (holding defendants have the burden of proving "fair dealing and fair price.").

[72] *Crimson*, 2014 WL 5449419, at \*12.

[73] *Id.*

In *In re Crimson Exploration Inc. Shareholder Litigation*,[74] the Court identified two instances where a controller engages in the kind of conflicted transaction that will justify entire fairness review.[75] The first is where the controller stands on both sides of the transaction.[76] In the transactions at issue here, the iHeart Defendants and Private Equity Defendants were clearly not on both sides of the transactions and GAMCO does not allege otherwise.[77]

The second category of conflicted transactions where Delaware courts will invoke entire fairness review involve those in which the controller "competes with the common stockholders for consideration."[78] These cases exist in three subsets:

---

[74] 2014 WL 5449419 (Del. Ch. Oct. 24, 2014).

[75] *Id.* at *12.

[76] *Id.  See also Larkin v. Shah*, 2016 WL 4485477, at *9 (Del. Ch. Aug. 25, 2016) ("[C]ases where the controller stands on both sides of the transaction present a particularly compelling reason to apply entire fairness: both corporate decision-making bodies to which Delaware courts ardently defer—the board of directors and disinterested voting stockholders—are considered compromised by the controller's influence.") (citing *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014)).

[77] Compl. Ex. G (December 23, 2015 Meeting Minutes) at CCOH000693.  Because GAMCO acknowledges that this is not a case where the alleged controllers stood on both sides of the transactions, several of the cases it cites in support of its argument that the Court must review the transactions for entire fairness are inapposite.  *See, e.g.*, *OTK Assocs., LLC v. Friedman*, 85 A.3d 696 (Del. Ch. 2014) (involving a controller on both sides of the transaction); *In re Ezcorp Inc. Consulting Agmt. Deriv. Litig.*, 2016 WL 301245 (Del. Ch. Jan. 25, 2016) (same); *Teachers Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654 (Del. Ch. 2006) (same).

[78] *Crimson*, 2014 WL 5449419, at *12.

41

(1) "disparate consideration" cases; (2) "continuing stake" cases; and (3) "unique benefit" cases.[79]

In a "disparate consideration" case, the controller takes more monetary consideration from the third-party transaction than is given to the minority.[80] In this case, there is no dispute that the challenged transactions led to *pro rata* dividends for all stockholders.

In a "continuing stake" case, the controller receives more consideration from the third-party transaction than the other stockholders in a form other than money—typically by retaining a continuing equity stake in the surviving entity while the minority common stockholders are cashed out.[81] The "continuing stake" cases by definition involve acquisition transactions, a scenario not applicable here.

GAMCO argues that this is a "unique benefit" case. In a "unique benefit" case, "the controller receives some sort of special benefit not shared with the other stockholders."[82] In essence, "the controller extracts something uniquely valuable

---

[79] *Id.* at *12–14.

[80] *See, e.g.*, *In re Tele-Communications, Inc. S'holder Litig.*, 2005 WL 3642727, at *7 (Del. Ch. Jan. 10, 2006) (class of high-vote stock received $376 million more in consideration than the single-vote stock).

[81] *See, e.g.*, *In re John Q. Hammons Hotels Inc. S'holders Litig.*, 2009 WL 3165613, at *7–8 (Del. Ch. Oct. 2, 2009) (a 72% controller of an acquired company received a combination of a small equity stake in the surviving entity, significant liquidation rights, a large line of credit, and various other contractual rights, while other stockholders received only cash).

[82] *Crimson*, 2014 WL 5449419, at *13.

to the controller, even if the controller nominally receives the same consideration as all other stockholders."[83]  GAMCO has seized upon a line of cases in which Delaware courts have applied entire fairness when a controller causes a company to enter into a transaction for the purpose of addressing an acute liquidity crisis confronting the controller.  In these cases, while the controller receives the same financial benefit as the other stockholders, it also receives the "unique benefit" of a quick infusion of cash that it requires to satisfy its need for liquidity.[84]

In *New Jersey Carpenters Pension Fund v. infoGROUP, Inc.*,[85] for example, infoGROUP's largest stockholder, who was also its founder and Chairman of the Board, had a unique and desperate need for liquidity based on a variety of factors including past legal actions and a desire to launch a new business.[86]  Through "a pattern of threats and bullying,"[87] the plaintiffs alleged that the controller was able to force a sale of the company "at an inopportune time and utilizing a flawed and inadequate sales process," which ultimately resulted in the stockholders receiving

---

[83] *Id.*

[84] *See N.J. Carpenters Pension Fund v. infoGROUP, Inc.,* 2011 WL 4825888 (Del. Ch. Oct. 6, 2011); *In re Answers Corp. S'holders Litig.*, 2012 WL 1253072, at *1–2, *7 (Del. Ch. Apr. 11, 2012); *McMullin v. Beran*, 765 A.2d 910, 921 (Del. 2000).

[85] 2011 WL 4825888 (Del. Ch. Sept. 30, 2011).

[86] *Id.* at *2–3.

[87] *Id.* at *3.

an unfair price for their shares.[88] Based on the extreme facts alleged, the Court

held that it was appropriate to require the defendants to prove the entire fairness of

the transaction because the controller was interested in the transaction, exercised

his position of control over the board to force it to provide him with a unique

benefit (the liquidity he desperately needed) and tainted the sales process in a

manner that ultimately resulted in an unfair price to the minority stockholders.[89]

*infoGROUP* is an extreme case.[90] As Chief Justice Strine, writing as

Chancellor, noted in *In re Synthes, Inc. S'holder Litig.*,[91] there are "very narrow

circumstances in which a controlling stockholder's immediate need for liquidity

could constitute a disabling conflict of interest irrespective of *pro rata*

treatment."[92] "Those circumstances would have to involve a crisis, fire sale where

---

[88] *Id.* at *2, *6.

[89] *Id*. at *7.

[90] As GAMCO correctly points out, *infoGROUP* does not stand alone as a case where this Court has recognized that the pursuit of a transaction to address a controller's liquidity need can yield a legally significant unique benefit for the controller. *See, e.g.*, *Answers Corp.*, 2012 WL 1253072, at *1–2, *7 (describing why the allegedly interested entity had a liquidity need that was unique, why a cash sale was necessary for monetization, why an immediate sale was necessary, that the interested entity had in fact sought a fast sale and had threatened to fire Answers Corp.'s entire management team unless a sale was completed in short order); *McMullin*, 765 A.2d at 921 (describing how the controlling stockholder unilaterally negotiated the transaction, placed cash restrictions on potential bidders, and sacrificed value in the transaction which might have been realized if the transaction had been timed or structured differently).

[91] 50 A.3d 1022 (Del. Ch. 2012).

[92] *Id.* at 1036.

the controller, in order to satisfy an exigent need. . . agreed to a sale of the corporation without any effort to" engage in a sales process that would reflect the market value.[93]  In a footnote, the court cited *infoGROUP* as a case where the facts reflected the kind of "narrow circumstances" in which a liquidity need would create a "unique benefit" for the controller—a case where a "controller forced a sale of the entity at below fair market value in order to meet its own idiosyncratic need for immediate cash, and therefore deprived the minority stockholders of the share of value they should have received had the corporation been properly marketed in order to generate a bona fide full value bid, which reflected its actual market value."[94]

*Synthes* did not go out on a limb; it applied the teaching of *Sinclair Oil* and its progeny,[95] where our Supreme Court held that when the controller "receive[s] nothing [in a transaction]. . . to the exclusion of [the] minority stockholders," the business judgment rule is the proper standard by which to evaluate the board's decision to approve the transaction even though the plaintiff alleged that the controller acted out of a "need for large amounts of cash."[96]  In so holding, the

---

[93] *Id.*

[94] *Id.*

[95] *See Synthes*, 50 A.3d at 1034 (citing *Sinclair Oil*).

[96] *Sinclair Oil*, 280 A.2d at 719, 721–22.  Indeed, as the Defendants point out, if a controller permits a dividend, in any case, that means it wants and likely needs the cash.

45

Supreme Court observed that "[t]he motives for causing the [board to proceed with the transaction] are immaterial unless the plaintiff can show that the dividend payments resulted from improper motives and amounted to waste."[97]

### 2. The Complaint Does Not Plead the Kind of "Narrow Circumstances" That Would Justify Entire Fairness Review

The facts of this case line up nicely with *Synthes* and *Sinclair Oil*. Unlike *infoGROUP*, or the other one-sided conflicted controller transactions where this Court has determined that a liquidity need caused a controller to exact a legally significant unique benefit to the detriment of the minority, the allegations here do not support a reasonable inference that the iHeart Defendants were competing with the minority common stockholders by sacrificing value either through threats, a flawed sales process, or an unfair price. As noted, GAMCO acknowledges that each of the challenged transactions were arms-length transactions with third parties. The Complaint's conclusory allegations that the transactions were "perpetrated to benefit the iHeart Defendants," "needless," and undertaken "at suboptimal prices" and "on Defendants' timetable to fund the iHeart Defendants"[98] are not only lacking in factual support, they are a far cry from the "very narrow circumstances" where this Court will find that an arms-length transaction with a

---

[97] *Id.*

[98] Compl. ¶¶ 4, 5.

46

third party yielded the kind of unique benefit to a controller that would justify entire fairness review.

The most GAMCO could muster as specific criticism of the Asset Sales process was an allegation that CCOH agreed to a $1.5 million reduction in the purchase price of assets sold to Lamar Advertising Company, in part so that it could rely on a REIT exemption from Hart-Scott-Rodino review.[99] While GAMCO characterizes this fact as evidence that the process was rushed so the proceeds could quickly be swept to the iHeart Defendants, the relatively modest accommodation on price hardly reflects the kind of "fire sale" that has prompted this Court to deny a board of the otherwise applicable business judgment presumption.[100] Indeed, the Asset Sales generated $602 million in cash, twelve times the 2015 OIBDAN for the assets and significantly higher than CCOH's own trading multiple.[101] CCOH's financial advisers believed the process and price were fair and the Board concluded "that, separate and apart from [iHM's] liquidity position, such transactions are in the best interest of [CCOH] and all of its

[99] Compl. ¶ 97.

[100] *See Synthes*, 50 A.3d at 1036 (noting that the "sort of uncommon scenario" where the Court would review for entire fairness would only arise where the plaintiff made "well-pled" allegations of "a crisis, fire sale where the controller, in order to satisfy an exigent need (such as a margin call or default in a larger investment) agreed to a sale of the corporation without any effort to make logical buyers aware of the chance to sell, give them a chance to do due diligence, and to raise the financing necessary to make a bid that would reflect the genuine fair market value of the corporation.").

[101] Compl. ¶ 93.

47

stockholders in light of the prices offered by the bidders for such non-core assets."[102]

GAMCO's allegations regarding the Note Offering fare no better. Besides summarily observing that the Note Offering will cause CCOH to incur substantial interest expense at an "over-market" rate without lowering the balance on the Revolving Note, and that it serves no rational business purpose,[103] allegations that are conclusory and of no inferential value, the Complaint alleges nothing that would support the notion that the Note Offering was of the nature of a fire sale that created a unique benefit for the iHeart Defendants to the detriment of CCOH and its stockholders.

Moreover, even though GAMCO oft-repeats the conclusory allegation that the CCOH Board focused only on a need to provide liquidity to the iHeart Defendants,[104] and gave no consideration to the potential benefits or detriments to CCOH or the other stockholders that might flow from the challenged transactions, these allegations are undercut by the Board minutes to which GAMCO has cited which reveal that the Board in fact considered and discussed the negative consequences for CCOH should the iHeart Defendants be forced into

---

[102] Compl. Ex. H (Jan. 4, 2016 Meeting Minutes) at CCOH000848.

[103] Compl. ¶¶ 82–91.

[104] Compl. ¶¶ 1, 83, 99, 132, 137.

bankruptcy.[105] Additionally, the Board minutes reflect that the Board identified and considered benefits from the transactions apart from avoiding liquidity problems for the iHeart Defendants, including the optimization of non-core assets for the benefit of stockholders.[106]

GAMCO has failed to plead the sort of extraordinary facts that would allow a reasonable inference that the iHeart Defendants extracted a unique benefit from CCOH at the expense of the other CCOH stockholders. The Asset Sales, Note Offering and related dividends, therefore, are subject to business judgment review. [107] Because the Complaint fails to plead facts that overcome the

---

[105] *See* Compl. Ex. E (Nov. 30, 2015 Meeting Minutes) at CCOH000663 ("At the request of the Board, Kirkland discussed with the Board how a bankruptcy filing at Parent could potentially impact that Company . . . ."); Compl. Ex. H (Jan. 4, 2016 Meeting Minutes) at CCOH000848 (the Board discussed "the potential costs [CCOH] is likely to incur if [iHM] encounters a liquidity problem").

[106] Compl. Ex. H (Jan. 4, 2016 Meeting Minutes) at CCOH000848 ("[I]t is Company management's belief that, separate and apart from parent's liquidity position, such transactions are in the best interest of the Company and all of its stockholders in light of the prices offered by the bidders for such non-core assets.") ("[M]embers of the Board expressed their view that each of the Transactions appear to enable the Board to operate the business appropriately for all stockholders, including in light of the potential costs the company is likely to incur if Parent encounters a liquidity problem. Members of the Board further expressed their initial view that each of the [Transactions] enable the Company to optimize the overall productivity of its assets.").

[107] Since the controlling stockholder was not conflicted, "even if it appointed a majority of the Board, that fact is not relevant to determining the directors' independence or interestedness in this transaction." *Crimson*, 2014 WL 5449419, at *21. If the controller is not conflicted as to the transactions, then Board members associated with the controller would not be interested in the transaction in a manner that would strip them of the presumption of the business judgment rule absent separately-pled board-level interests in the transactions not alleged here. I have not reached the Defendants' argument that

presumption of the business judgment rule, GAMCO has failed to plead a viable claim for breach of fiduciary duty.[108] And because the claims for breach of fiduciary duty must be dismissed, GAMCO's claim for aiding and abetting breaches of fiduciary duty (Count III) must also be dismissed.[109]

## E. GAMCO Has Failed to State a Claim for Unjust Enrichment

GAMCO's unjust enrichment theory is that the iHeart Defendants and Private Equity Defendants enriched themselves at the expense of CCOH and its minority stockholders through the Revolving Note, the Note Offering, and the Asset Sales. This exact theory, "simply couched in fiduciary duty terms," forms the basis of GAMCO's fiduciary duty claims against the Defendants.[110] Therefore, "it is fair to say that the unjust enrichment claim depends *per force* on the breach

---

GAMCO has failed to plead non-exculpated claims against the independent directors, Tremblay, Temple and Jacobs, because I have concluded that GAMCO has not pled actionable breach claims against any of the Board members.

[108] *See Sinclair Oil*, 280 A.2d at 721–22 (holding that plaintiff failed to plead a claim for breach of fiduciary duty by failing to plead "that the dividend payments resulted from improper motives or waste").

[109] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (stating the four elements of a claim for aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by defendants, and (4) damages proximately caused by the breach) (internal citations omitted); *see also In re KKR Fin. Hldgs LLC S'holder Litig.*, 101 A.3d 980, 1003 (Del. Ch. 2014) ("An aiding and abetting claim 'may be summarily dismissed based upon the failure of the breach of fiduciary duty claims against director defendants.'") (quoting *Meyer v. Alco Health Servs. Corp.*, 1991 WL 5000, at *2 (Del. Ch. Jan. 17, 1991)).

[110] *Frank v. Elgamal*, 2014 WL 957550, at *31 (Del. Ch. Mar. 10, 2014).

of fiduciary duty claim . . ."[111] As this Court has said before, "the Court frequently treats duplicative fiduciary duty and unjust enrichment claims in the same manner when resolving a motion to dismiss."[112] For this reason, and because the iHeart and Private Equity Defendants were enriched no more or less than GAMCO, Count IV of the Complaint must be dismissed.

## F.    GAMCO Has Failed to State a Claim for Waste

The standard for waste is met if the board's decision cannot be "attributed to any rational business purpose."[113] GAMCO has not alleged facts that meet this high burden because they have not pled facts that allow a reasonable inference that the challenged transactions were "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."[114] This is an inference that is difficult to sustain in any case;[115] it is particularly so here.

The Asset Sales and Note Offering were arms-length transactions that resulted in *pro rata* dividends. While GAMCO argues that the CCOH Board gave

---

[111] *Id.*

[112] *Id.*

[113] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006).

[114] *Id.*

[115] *Espinoza v. Zuckerberg*, 124 A.3d 47, 67 (Del. Ch. 2015) (noting that a "rare" set of facts will create a reasonable inference of waste).

no consideration to any benefit that would flow from the transactions to CCOH, the documents appended to GAMCO's own Complaint reveal a different story.[116] The Board's decision to approve arms-length transactions for reasonable value that provided liquidity for a controlling stockholder to which CCOH, for better or worse, is inextricably tied by stringent contractual arrangements clearly can be attributed to a rational business purpose. Because GAMCO has not met its burden to plead facts that if proven would satisfy the standard for waste, Count V of the Complaint must be dismissed.

## III. CONCLUSION

For the foregoing reasons, GAMCO has failed to state viable claims for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, unjust enrichment or corporate waste. Accordingly, Defendants' Motion to Dismiss the Complaint with prejudice is **GRANTED**.

**IT IS SO ORDERED.**

---

[116] *See supra* notes 105 and 106.