Charlotte ADAMS, Executrix to the Estate of Stella Jankouskas a/k/a Stella Jann, Jan's Apartments, Inc., a corporation of the State of Delaware, Dolores Adams, Executrix for the Estate of Eugene Grez, and Dolores Adams, individually, Defendants Below, Appellants,

v.

John J. JANKOUSKAS, a/k/a John J. Jann, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted June 15, 1982.

Decided Sept. 15, 1982.

L. Coleman Dorsey, Wilmington, for defendants below, appellants.

Kenneth M. Roseman, D'Angelo, Ciconte & Roseman, Wilmington, for plaintiff below, appellee.

Before QUILLEN, HORSEY and MOORE, Justices.

MOORE, Justice:

In this appeal we face certain unique questions of Delaware law arising from a post-trial decision of the Court of Chancery imposing either a constructive or resulting trust on half of the assets, claimed to be part of the estate of Stella Jankouskas, also known as Stella Jann (Stella), in favor of John Jankouskas, also known as John Jann (John). These questions include not only the propriety of imposing such a trust, but the applicability to this action of Delaware's non-claim statute (12 *Del.C.* § 2102), requiring the presentation of claims within 6 months of the opening of an estate. The former Chancellor ruled that the unusual aspects of the relationship between John and Stella justified the imposition of a trust, and that John's cause of action was not within the purview of the non-claim statute. We affirm those rulings. However, we reverse and remand for a re-calculation of the award to John, including an apportionment of taxes, costs, fees and expenses necessary for, and directly attributable to, the maintenance and preservation of the assets John has received or been awarded.

### I

On December 23, 1944 John married Stella in Elkton, Maryland. Both had been married before, and each had children by their prior marriages. Stella, then known as Stella Grez, was divorced, but records indicate that John's divorce from his first wife was not final until 1947.[1]

At the time of the marriage, Stella was the owner and operator of a small beauty shop which she had purchased a few months earlier. She apparently saved parsimoniously to buy the shop (even putting her 2 young sons by her previous marriage in an orphanage), but when she married John it was not a particularly profitable enterprise. Before the marriage John had held a string of jobs with various companies and, at the time of the marriage, he was earning approximately $150 a week. In 1948, he secured employment with the duPont Company where he worked until his retirement in 1978.

With the assistance of counsel Stella set up a corporation in July 1947 named "Jan's Apartments", and all 100 shares of the common stock of the corporation were issued in her name. In addition to accumulating other assets, the initial investment of "Jan's Apartments" was in an apartment building at 829 Washington Street which John renovated. About five years later Stella moved her beauty parlor to this building. The corporation also acquired a house at 2409 Franklin Street, which became John and Stella's family residence. John paid monthly rent to the Corporation for their joint use of the house.

Stella was clearly the dominant partner in the marriage and she mainly controlled the family finances. From the beginning of the marriage John surrendered his paycheck to Stella, who then deposited it either in their joint account or the corporate account of Jan's Apartments. John in turn received a nominal sum from Stella for spending money. Early in the marriage the funds in the joint account were used primarily for basic living expenses, but later some of these funds were invested by Stella in stocks, bonds, certificates of deposit and other assets.

The trial testimony indicates that John and Stella voluntarily pooled John's earnings from duPont, and the earnings of the

---

1. The validity of John and Stella's marriage, as a matter of law, is not before us, and we do not address it in disposing of the trust and fiduciary questions decided here. Thus, in speaking of their "marriage" in this opinion we do so as a short way of referring to the marriage ceremony that actually occurred and the ostensible relationship that followed it.

beauty parlor and the corporation.[2] Several witnesses testified that John and Stella were saving "so that they could enjoy their retirement together". In effect they were "planning for the future" and setting aside a "nest egg" for their old age. John testified that the pooling was based upon their agreement that, "what's mine is yours and what's yours is mine". According to John, the understanding was "if [he] died she had everything and if she died [he] had everything".

Stella died in October 1977 leaving an estate valued at over $350,000, approximately $40,000 of which consisted of personal property held in their joint names. Except for this property, a diamond ring, an automobile and $10,000 in cash, all bequeathed to John, Stella's will purported to make her niece, Dolores Adams, the daughter of Stella's sister and executrix, her sole ultimate beneficiary. Virtually all the assets acquired by either party during the marriage were considered by the executrix to be assets of Stella's estate.

In November 1977, John went to the offices of the attorney for the estate and received certain items bequeathed to him in the will, including the jointly held savings bonds and securities, and executed a receipt for them. On September 18, 1978, he again went to counsel's office and received the remaining items of the bequest, but this time he executed both a receipt and release. John was not represented by counsel on either occasion. Subsequently, John brought this action on September 27, 1979, almost two years after Stella's death. Following trial, the former Chancellor awarded John 50% of the estate left by Stella on the theory that the transactions between Stella and John created a constructive or resulting trust on Stella's part for the benefit of John.

**2.** The unrebutted expert testimony of John's accountant showed that John's lifetime earnings from 1944 to the time of Stella's death were approximately $327,541. The earnings from the beauty shop over the same period were approximately $259,015, and the earnings from "Jan's Apartments" from its inception in 1947 to Stella's death in 1977 were $30,672 (excluding investment income). Thus, the total contributions during the marriage were approx-

## II

In their appeal defendants rely on four basic theories. First, there is insufficient evidence to support the imposition by the Court of Chancery of a constructive or resulting trust; second, John's claims are barred by the Delaware "non-claims" statute; third, John's claims are barred by his execution of a release; and fourth, John's claims are barred by the doctrine of laches. In the alternative, defendants also assert that the Court of Chancery erred in determining which assets were to be the subject of the trust and in refusing to assess against John certain taxes, costs, fees and expenses incurred by the defendants.

## III

When reviewing the findings of fact of the Court of Chancery, this Court will accept them if they are supported by the record and are the product of an orderly and logical deductive process. We will make contrary findings only if the findings below are clearly wrong and justice requires that they be overturned. *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671 (1972); *Application of Delaware Racing Association,* Del.Supr., 213 A.2d 203 (1965). And where, as here, the trial court was faced with conflicting testimony, we accord great deference to the findings of the trial judge who heard all the witnesses. *See In re Two Minor Children,* Del.Supr., 173 A.2d 876 (1961).

The Chancellor imposed a constructive or resulting trust over the assets of the estate held by Stella's executrix.[3] These two trust theories are similar in that they are both "implied" trusts, that is, their existence is

imately $617,228. Attributing the earnings of the corporation and the beauty parlor to Stella, she contributed approximately $289,687, to John's $327,541. The expert also estimated the family's living expenses for this period at approximately $257,864.

**3.** While the Chancellor discussed both theories, he did not specify which one he relied on.

not based upon a valid written trust agreement. Although a constructive trust and a resulting trust are similar in effect, they are based upon entirely different theories.

■ A resulting trust arises from the presumed intentions of the parties and upon the circumstances surrounding the particular transaction. *Bodley v. Jones,* Del.Supr., 30 Del.Ch. 480, 59 A.2d 463 (1947); *Greenly v. Greenly,* Del.Ch., 29 Del.Ch. 297, 49 A.2d 126 (1946). In imposing a resulting trust, the court presumes, absent contrary evidence, that the person supplying the purchase money for property intends that its purchase will inure to his benefit, and the fact that title is in the name of another is for some incidental reason. *Greenly v. Greenly,* 49 A.2d at 129; *Branca v. Branca,* Del.Supr., 443 A.2d 929 (1982). *See also* 5 Scott, The Law of Trusts § 440 (3rd ed. 1967); Bogert, The Law of Trusts and Trustees § 454 (rev. 2nd ed. 1977). Conversely, a constructive trust does not arise from the presumed intent of the parties, but is imposed when a defendant's fraudulent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another to whom he owed some duty.[4] *Opdyke v. Kent Liquor Mart, Inc.,* Del.Supr., 181 A.2d 579 (1962); *Brophy v. Cities Service Co.,* Del.Ch., 70 A.2d 5 (1949); *Greenly v. Greenly,* 49 A.2d at 129.

■ Although most resulting trust cases involve the purchase of real property, the theory upon which they are based equally applies to acquisitions of personality. *Bogert, supra,* at § 454, p. 627. It has also been applied to situations in which the purchase price for property has been paid out of partnership or community assets. *Bogert, supra,* at § 454, p. 630. In a case involving purchases made with partnership or community funds, the trust "results" in favor of the partnership or the community. *Id.* This rule is applicable when, as here, the property was bought with joint funds.

In reviewing the evidence, the Chancellor found:

Here, it is established by the evidence adduced at trial that at the inception of their marriage both parties contributed their earnings to a species of joint account, petitioner's contributions initially constituting a large percentage of such funding. The evidence also establishes that title to such acquisitions was placed in the name of the decedent. I am satisfied after trial that the source of funds used by the decedent to acquire her initial holdings was from the parties' pooled funds since there is no other credible source of money for such acquisitions.

■ There is ample competent evidence in the record supporting these findings. Virtually everyone testified that John sur-

---

**4.** A good discussion of the differences between these two trusts is as follows:

*Resulting trusts* arise where the legal estate is disposed of or acquired, not fraudulently or in the violation of any fiduciary duty, but the intent in theory of equity appears or is inferred or assumed from the terms of the disposition, or from the accompanying facts and circumstances, that the beneficial interest is not to go with the legal title. In such a case a trust 'results' in favor of the person from whom the equitable interest is thus assumed to have been intended, and whom equity deems to be the real owner (see §§ 1031 et seq.).

*Constructive trusts* are by equity for the purpose of working out right and justice, where there was no intention of the party to create such a relation, and often directly contrary to the intention of the one holding the legal title. All instances of constructive trust may be referred to what equity denominates fraud, either actual or constructive, including acts or omis-

sions in violation of fiduciary obligations. If one party obtains the legal title to property, not only by fraud or by violation of confidence or of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner (see §§ 1044 et seq.). Courts of equity, by thus extending the fundamental principle of trusts—that is, the principle of a division between the legal estate in one and the equitable estate in another—to cases of actual or constructive fraud and breaches of good faith, are enabled to wield a remedial power of tremendous efficacy in protecting the rights of property.

1 Pomeroy's Equity Jurisprudence § 166, at 210–11 (5th ed. 1941) (emphasis in original).

rendered his weekly paycheck to Stella (Di-Bonaventura, T–36; Mrs. Sukach, T–65; Shirley Jann, T–83, 84; A. Grez, T–126; J. Jann, T–164; D. Adams, T–391). Then it was deposited in either a joint checking account (D. Adams, T–391) or paid over to the corporation (Wm. Sukach, T–71; J. Jann, T–318). According to John, all three incomes (his earnings, the earnings of the beauty shop, and the earnings of the corporation) were pooled (J. Jann, T–295), and the understanding between John and Stella was that with respect to these earnings, "[e]verything was 50–50" (J. Jann, T–166). In other words, "[W]hat's mine is yours, and what's yours is mine" (J. Jann, T–166). He further testified that according to their agreement, if he "died she had everything and if she died I [John] had everything" (J. Jann, T–166). This testimony was corroborated by other witnesses who stated that Stella told them she was depositing John's money "for his old age" (Mrs. Sukach, T–59). "[T]hey were saving together so that they could enjoy retirement together" (Mrs. Sukach, T–62). And according to Stella's son, Alfred Grez, John "relied on [Stella] to—for planning, for saving, for everything ..." (A. Grez, T–124). In addition, Shirley Jann, John's daughter by his first marriage, testified that both Stella and John told her that John was working extra hard (his regular job, overtime, and in the beauty shop) "to put a nest egg away" (T–85); and Stella told her that they were both working hard "because we are planning for the future" (T–89).

The Chancellor's conclusions that the beauty shop was not particularly profitable

in its early years and that Stella entered the marriage in a precarious financial condition are supported by testimony of both Alfred Grez, Stella's son by her prior marriage, who she had put in an orphanage (T–129, 134), and John (T–158).

Finally, on direct examination, Stella's ultimate beneficiary, Dolores Adams, an apparently hostile witness, conceded the occurrence of three transactions during the later years of the marriage in which Stella withdrew funds from the joint account and deposited them in savings account in her name only (T–392–96). Presumably, other such transactions could have been proven, but many of the records pertaining to Stella's affairs were destroyed by the executrix, or someone purportedly acting on advice of her counsel (T–396–397).[5]

Thus, the Court of Chancery properly imposed either a resulting or constructive trust on the assets accumulated from joint contributions. It is important to note that this is not a case where a party was disappointed with what he received under a will. Rather, it is one in which joint funds were committed in obvious trust to one partner and then pooled to purchase property and make investments for the mutual benefit of both. Under these circumstances Chancery may impose this trust upon the accumulated assets in whatever form they now take.

## IV

Despite this, the defendants argue that John faces the formidable hurdle of Delaware's "non-claim" statute, 12 *Del.C.* § 2102.[6] The obvious purpose of the "non-

---

**5.** There also was sufficient competent evidence that Stella never intended to keep her word to John about the ultimate use of the assets accumulated from their joint funds, thus supporting the Chancellor's conclusion that grounds existed for the imposition of a constructive trust. One of Stella's former employees testified:

    A. ... The only thing she talked about all the time was her will, and she changed her mind about that so many times.

    Q. What did she say about her will?

    A. Well she told me on several occasions that when she died Mr. Jann was going to be in for a real surprise; that he wasn't going to

get half of what he thought he was going to get (T–38).

Stella's son also testified:

    Basically one of the things that I always felt irritable about is the fact that I knew that she was trying to cut Mr. Jann out from the will (T–129–30).

**6.** 12 *Del.C.* § 2102 provides in pertinent part:

    (a) All claims against a decedent's estate which arose before the death of the decedent, including claims of the State and any subdivision thereof, whether due or to become due, absolute or contingent, liquidated or unliquidated, founded on contract, tort or other legal

claim" statute is to compel claimants, other than those with claims which the personal representative is required to take notice of by statute, to present their claims within a shortened period of limitations (6 months) to facilitate prompt settlement of the estate. *Brockson v. Richardson Bros., Inc.,* Del.Super., 24 A.2d 537 (1942). The statute is worded in broad terms to accomplish its purpose. It expressly covers "[a]ll claims" against the estate.

But does this unusual case really involve a "claim" against Stella's estate, as that term is intended by the statute? John's claim, if it is in fact a claim, is not an unpaid debt, tax, judgment or a right arising out of tort or contract. Instead, it is an attempt to recover by a resulting or constructive trust certain property in the hands of the executrix which in equity she had no beneficial right to keep.

On this point the Chancellor ruled:

> ... as stated above, this action is based on the theory that decedent wrongfully appropriated petitioner's property for the benefit of her estate, and that his petition accordingly constitutes a claim not against the wife's estate but rather against the executor for refusing to recognize petitioner's interest in such property, the bar of 12 Del.C. § 2102 which applies to certain claims against decedents' estates does not, in my opinion apply to this action. (Unreported)

The court also based its ruling on the clearly supportable theory that "the trust in petitioner's favor is not and never was a part of decedent's estate." Other jurisdictions seem to support this theory, although the cases must be approached with some caution because of the differing language of the various non-claim statutes.

However, in all of the cases there is a consistent underlying basis or theory supporting them, which appears equally pertinent to an interpretation of our non-claim statute, that the statute is inapplicable to claims for property held by the decedent in trust, whether express, constructive, or resulting. This arises from the concept that a trustee has only legal and not beneficial or equitable ownership of the trust res. Thus, the property which is the subject of the trust does not, indeed it cannot, become part of the estate.

The simplest proposition is that non-claim statutes are inapplicable to "claims" over funds held pursuant to an express trust. *Stern v. Morris,* Fla.Dist.Ct.App., 380 So.2d 1048 (1980). As stated by the Alabama Supreme Court:

> The rule in this state is that the requirement of presentation of claims against an estate is inapplicable to the claims of a cestui que trust for whom the decedent was trustee so long as the trust fund or

basis, if the Register of Wills observes the requirements of § 2101 of this title, are barred against the estate, if not barred earlier by other statute of limitations, the personal representative and the heirs and devisees of the decedent, unless within 6 months from the date of granting of letters to the executor or administrator notice is given in compliance with § 2104 of this title or unless notice is presumed under § 2103 of this title.

(b) All claims against a decedent's estate which arise at or after the death of the decedent, including claims of the State or any subdivision thereof, whether due or to become due, absolute or contingent, liquidated or unliquidated, founded on contract, tort or other legal basis, unless presented in accordance with § 2104 of this title, are barred against the estate, the personal representatives and the heirs and devisees of the decedent, as follows:

(1) A claim based on a contract with the personal representative, within 6 months after

performance by the personal representative is due;

(2) Any other claim, within 6 months after it arises.

(c) Any claim not barred under subsections (a) and (b) of this section which has been rejected by an executor or administrator shall be barred forever unless an action or suit be commenced thereon within 3 months after the executor or administrator has notified the claimant of such rejection by writing delivered to him in person or mailed to his last address known to the executor or administrator; provided, however, in the case of a claim which is not presently due or which is contingent or unliquidated, the executor or administrator may consent to an extension of the 3-month period, or to avoid injustice the Court of Chancery, on petition, may order an extension of the 3-month period, but in no event shall the extension run beyond the applicable statute of limitations.

property can be traced and the trust enforced by appropriate proceedings. This is for the reasons that the cestui que trust is seeking his own property only, and is not seeking to enforce a claim against the estate and property of the decedent.

*King v. Coosa Valley Mineral Products Co.,* Ala.Supr., 283 Ala. 197, 215 So.2d 275, 282 (1968). Significantly, this rule has been deemed equally applicable to constructive and resulting trusts:

> Similarly no claim is necessary where a constructive trust is sought to be imposed against estate property, . . . or a resulting trust is claimed: . . . "It is well settled that one who claims as his own, adversely to an estate, specific property held and claimed by the estate cannot be called a creditor of the estate within the meaning of the probate law. The decisions are clear and conclusive upon the proposition that where one seeks to recover from the representative of an estate specific property alleged to have been held in trust by the decedent at the time of his death, he is not seeking payment of a claim from the assets of the estate, is not required to present a claim as creditor, and is not a 'creditor of the estate.' "

*Payless Drug Stores v. Bechdolt,* Cal.App., 92 Cal.App.3d 496, 155 Cal.Rptr. 58, 60 (1979). This result also was reached by a Florida court, and we note that Florida's statute is similar to ours, in that it refers to "No *claim* or demand":

> [I]t has been well established that this non-claim statute is not applicable to a claimant who alleges that he holds equitable title to specific identifiable property, legal title to which is in the decedent, *and is seeking to impress a resulting or constructive trust in this property for the reason that the property held in trust does not constitute part of the estate.*

*Fisher v. Creamer,* Fla.Dist.Ct.App., 332 So.2d 50, 51–52 (1976). Using a similar theory, non-claim statutes have been held inapplicable to claims regarding jointly held funds, *In re Estate of Mellott,* Kan.Ct.App., 1 Kan.App.2d 709, 574 P.2d 960 (1977); community property, *Kenworthy v. Hadden,* Cal.App., 87 Cal.App.3d 696, 151 Cal. Rptr. 169 (1979); and partnership assets, *Lecky v. Staley,* Ariz.Ct.App., 6 Ariz.App. 556, 435 P.2d 63 (1967). Moreover, disputes regarding the ownership of personal property claimed by an estate are not barred by the applicable non-claim statute. *In re Estate of Blaney,* Wyo.Supr., 607 P.2d 354 (1980); *In re Estate of Haywood,* Colo.Ct. App., 43 Colo.App. 127, 599 P.2d 976 (1979); *Zeidel v. Estate of Rosenberg,* Fla.Dist.Ct. App., 357 So.2d 259 (1978).

Thus, we are bound to conclude that based on the unique facts here, the Chancellor's ruling, excepting this action from the non-claims statute, was legally correct.

## V

■ Defendants next contend that John's execution of a receipt and release on September 18, 1978, when he received some of the property left to him by Stella, bars his present claims.[7] Delaware law recognizes the validity of a general release. *Cha-*

---

7. The release and receipt that John executed states:

> *KNOW ALL MEN BY THESE PRESENTS, THAT* I JOHN JANN *do hereby acknowledge to have received of and from* CHARLOTTE ADAMS, Executrix of the estate of Stella Jankauski also known as Stella Jann *late of* New Castle County and State of Delaware *deceased* Stella Jankauski, also known as Stella Jann *the sum of* $10,000.00, a 6.5 carat diamond ring, one Cadillac automobile, and all securities owned jointly with my wife *in full payment and satisfaction of* the bequest in Item Four of the will of Stella Jankauski, also known as Stella Jann. *And I do hereby release and forever discharge the said* executrix *as aforesaid of and* from *all actions, suits, accounts and demands whatsoever, for or concerning the said* bequest *or for, or concerning the estate of the said* Stella Jankauski also known as Stella Jann, *deceased or any part thereof from the beginning of the world to the date hereof.*
>
> *IN WITNESS WHEREOF, I have hereunto set my hand and seal this* 18th *day of* September *in the year of our Lord One Thousand Nine Hundred and* Seventy-Eight.
> *Signed, Sealed and Delivered*
> *in the presence of*
> S/L Coleman Dorsey  S/John J. Jann *(Seal)*
> (The words in italics represent preprinted words on the form and the remaining portions were filled in by counsel for the executrix.)

*kov v. Outboard Marine Corp.,* Del.Supr., 429 A.2d 984 (1981). In construing a release, the intent of the parties as to its scope and effect are controlling, and the court will attempt to ascertain their intent from the overall language of the document. *Raughley v. Delaware Coach Co.,* Del.Supr., 8 Terry 343, 91 A.2d 245 (1952). *See also Chakov v. Outboard Marine Corp., supra.* And where the language of the release is clear and unambiguous, it will not lightly be set aside. *See Hob Tea Room v. Miller,* Del.Supr., 33 Del. Ch. 38, 89 A.2d 851 (1952). Where, however, the language of the release is ambiguous, it must be construed most strongly against the party who drafted it. *Modern Auto Finance Corp. v. Preston,* Conn.App., 2 Conn.Civ. 492, 202 A.2d 845 (1964); *La Belle v. DiStefano,* R.I.Supr., 85 R.I. 359, 131 A.2d 814 (1957).

■ Here, the language of the document is rather confusing. The first part speaks in terms of receipt, as opposed to release, and refers specifically to a release of claims with respect to "the bequest in Item Four" of Stella's will. This specific recital of the subject matter of the release is followed by language purporting to be a general release of all claims against the estate.

In light of this ambiguity, and the apparent conflict between the specific release language and the terms of general release, the Chancellor properly applied the following rule of construction:

> The rule in such cases is that words of general application used in the release which generally follow a specific recital of the subject matter concerned are not to be given their broadest significance but will be restricted to the particular matters referred to in the recital.

**8.** The unrebutted testimony concerning the execution of the document is significant:

Q. All right. Now, Mr. Jann, before you signed the release which has now been marked as Defendants' Exhibit 4, did Mr. Dorsey give you an opportunity to read it?
A. Oh, yes, he did, but this is just a receipt for what he gave me.
Q. It's just a receipt for what he gave you?
A. That's right. (T–309)

\* \* \* \* \* \*

*See, e.g., Williams v. Riley,* Mo.Ct.App., 243 S.W.2d 122 (1968); *Kent v. Fair,* Pa.Supr., 392 Pa. 272, 140 A.2d 445 (1958); *Lancaster Trust Co. v. Engle,* Pa.Supr., 337 Pa. 176, 10 A.2d 381 (1940); 66 Am.Jur.2d *Releases* § 31 (1973).

■ Applying this rule of construction to the release here, we are satisfied that the document by its terms is limited to the specific bequest in Item Four of Stella's will. It also follows from what has been said earlier (see parts III and IV) that the release does not and cannot bar John's action for the imposition of a resulting or constructive trust over property which should not have been (but the executrix claimed to be) part of Stella's estate.

Finally, this conclusion is buttressed by the fact that the language of the release could be construed by one who is not legally trained as merely a receipt for property delivered, and at most a release limited to claims for the property specifically described in the document. Moreover, when the document was signed the executrix had failed to timely file the inventory of the estate in accordance with her statutory duty. Had she done so there may have been an arguable suggestion that John intended such a broad release, since he would have been on legal notice of the extent to which the executrix was claiming property John considered his own. That, however, did not happen, and the situation is further complicated by the fact that counsel for the estate, who drafted portions of the release, was present at the signing, while John was unrepresented. *Compare Chakov v. Outboard Marine Co.,* Del.Supr., 429 A.2d 984 (1981).[8]

Q. Are you telling us, Mr. Jann, that Mr. Dorsey did not explain to you that you were signing a full release releasing the estate in every respect?
A. No, he didn't. I gave him the receipt for the material received, and what Mr. Dorsey should have did [sic] was tell me to get myself a lawyer to represent me, and he didn't, and I didn't know any better at the time because what in the hell do I know about law? What do I know about law? (T–311)

\* \* \* \* \* \*

Under these circumstances we are satisfied that the record adequately supports the Chancellor's findings and conclusions that the release was inapplicable to the claims here presented.

### VI

■ We turn now to defendants' contention that John's claims are barred by laches. This doctrine is rooted in the maxim that equity aids the vigilant, not those who slumber on their rights. *See Hutchinson v. Fish Engineering Corp.,* Del. Ch., 203 A.2d 53 (1964); 2 Pomeroy's Equity Jurisprudence § 418, at 169 (5th ed. 1941). As explained by Chief Justice Layton:

A court of equity moves upon considerations of conscience, good faith and reasonable diligence. Knowledge and unreasonable delay are essential elements of the defense of laches. The precise time that may elapse between the act complained of as wrongful and bringing of suit to prevent or correct the wrong does not, in itself, determine the question of laches. What constitutes unreasonable delay is a question of fact dependent largely upon the particular circumstances. No rigid rule has ever been laid down. Change of position on the part of those affected by non-action, and the intervention of rights are factors of supreme importance.

*Federal United Corp. v. Havender,* Del. Supr., 24 Del. Ch. 318, 11 A.2d 331, 343 (1940). While the limitations of actions applicable in a court of law are not controlling in equity, absent unusual circumstances, the analogous statute of limitations will be given great weight in deciding whether the plaintiff's claim is barred by laches. *Vredenburgh v. Jones,* Del. Ch., 349 A.2d 22 (1975); *Bay Newfoundland Co. v. Wilson & Co.,* Del. Ch., 24 Del. Ch. 30, 4 A.2d 668 (1939). Defendants argue that John's claims arose at some time before Stella died, possibly as much as 30 years ago when

their share and share alike arrangement was well established. Wholly apart from the fact that John's cause of action did not arise from a single event, but from a continuing series of transactions spanning virtually the entire period from 1944 to 1977, and culminating in the executrix's claim to property she had no right to, there are several reasons why the defendants are in no position to invoke laches here.

■ First, the record supports the finding that throughout the marriage John, at least, believed he and Stella were working, saving and pooling their income and assets for their later mutual benefit. It was only after Stella's death that he evidently realized the perfidy of her intent. Thus, it would be inequitable to charge him with sleeping on his rights during a period when he had no reason to suspect they were in jeopardy.

Second, in applying an analogous statute of limitations to any rights of John that matured after Stella's death, we have already ruled that the shortened six-month period of the non-claim statute has no pertinency to actions of this sort.

■ Finally, the executrix, whose daughter is Stella's major ultimate beneficiary, did not comply with the statutory requirements of 12 *Del. C.* § 1905, mandating the filing of an inventory and appraisal within three months after the executrix assumed her duties. This is no mere ministerial chore to be taken lightly. The purpose and intent of our law is to provide for the expeditious settlement of estates for the benefit of all concerned. As we have noted, if the executrix had complied with the law in timely fashion there at least would have been an arguable suggestion that John was on public notice of the extent to which his own property was being included in Stella's estate, thereby justifying imposition of laches. However, when a person fails to timely perform a statutory duty, the purpose of which, at least in part, is to put

---

After reading John the provisions of the general release, the executrix' counsel asked:

Q. ... Did you read that language before you signed this document?

A. I didn't read it because I wouldn't have signed it. (T–312)

another on notice that his or her vital interests are being affected, then such misfeasance cannot be converted into a shield by the former against the latter.

Thus, we are not persuaded by defendants' arguments that we should measure the time for the purpose of laches either from some point prior to Stella's death on October 27, 1977 or within six months thereafter. John filed this action on September 27, 1979, twenty-three months after Stella died. The analogous statute of limitations was three years (10 *Del. C.* § 8106).[9] Therefore, whether the time period commenced with Stella's death, or the filing of the inventory on November 3, 1978, when the intentions of Stella's executrix became obvious beyond preadventure, the suit was timely, and we see no reason to reject the general rule applied by the Court of Chancery in this case.

## VII

■ This brings us to defendants' final point, that the Chancellor erred in the apportionment of the property to John and in failing to equally spread the burden of taxes, costs, fees, and expenses applicable to the preservation and maintenance of that property while it was in the executrix's hands. As noted previously, the trust was imposed in part upon the theory that John had contributed approximately 50% of the funds to the accumulation of assets, and upon the finding that it was "the parties' understanding that each would share equally in the fund which had been built up by their joint efforts during the course of their marriage." But in structuring the trust, the trial court did not follow this conclusion and considered only the assets held by the executrix after the jointly held property and the items specifically bequeathed to

John under Stella's will had already passed to him.

To the extent that these items were purchased with joint funds, the Chancellor's reasoning mandated that they be considered in determining the 50–50 apportionment, and thus the extent of the trust. By ignoring them in the calculations, John will receive more than one-half of the assets accumulated from joint funds, which is inconsistent with the Chancellor's ultimate conclusions. While we affirm those conclusions, it is the inconsistent result that we reverse.

The Court of Chancery found that Stella's "apparent" total assets were $342,421.83. To this figure was added accrued income of $50,340.89, for a total of $392,726.72. Then the Court divided this amount in half to determine John's proportional share of $196,381.36. This figure was then reduced by $14,689.32, representing John's share of the expenses incurred by the respondents to maintain the assets. Thus, judgment was entered for John in the amount of $181,692.04, exclusive of the property he had already received under Stella's will. We conclude that this was error since it failed to take account of the jointly held property and the bequests John received under Stella's will.

The respondents also made various arguments with respect to credit for taxes, costs, fees and expenses incurred in preserving the assets John has now received or been awarded. We believe that these expenses should be borne by the parties on an equal basis to the extent they are directly attributable to the maintenance and preservation of the assets John received. Accordingly, we reverse the judgment of the Court of Chancery and remand solely for a recal-

---

**9.** 10 *Del.C.* § 8106 provides as follows:

No action to recover damages for trespass, no action to regain possession of personal chattels, no action to recover damages for the detention of personal chattels, no action to recover a debt not evidenced by a record or by an instrument under seal, no action based on a detailed statement of the mutual demands in the nature of debit and credit between parties arising out of contractual or fiduciary relations, no action based on a promise, no action based on a statute, and no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action....

culation of the amount of the trust imposed, based on the trial court's conclusion of a 50–50 division of property acquired with joint funds, and, consistent with that conclusion, for a determination and award of any credit to which the defendants may be entitled for one-half of the taxes, costs, expenses and fees necessary for, and directly attributable to, the maintenance and preservation of the assets John has received under Stella's will, or been awarded pursuant to a judgment of the Court of Chancery.

\* \* \*

Affirmed in part, reversed in part and remanded.