# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ROBERT W. SEIDEN ESQ. in his capacity as Receiver for Southern China Livestock, Inc., | : : : | |
| Plaintiff, | : : | |
| v. | : : | **C.A. No. 9861-VCS** |
| SHU KANEKO a/k/a JOSEPH KANEKO, LIQIANG SONG a/k/a LIQUANG SONG a/k/a LI SONG a/k/a SONG LIQIANG a/k/a LI QIANG SONG a/k/a RICHARD LEE, | : : : : : : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Date Submitted: February 13, 2017
Date Decided: March 22, 2017

Jonathan M. Stemerman, Esquire of Elliott Greenleaf, P.C., Wilmington, Delaware and Douglas E. Spelfogel, Esquire and Katherine R. Catanese, Esquire of Foley & Lardner LLP, New York, New York, Attorneys for Plaintiff.

Andrew D. Cordo, Esquire and Toni-Ann Platia, Esquire of Ashby & Geddes, Wilmington, Delaware and Adrienne M. Ward, Esquire and John B. Horgan, Esquire of Ellenoff Grossman & Schole LLP, New York, New York, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

After accepting a capital infusion from United States-based investors through a private placement, Southern China Livestock, Inc. ("SCLI" or "the Company"), a Delaware holding company that owned a non-public, China-based operating company, "went dark" leaving its investors scrambling to recover their money. Unfortunately, this is a scenario that has been played out all too frequently in this court. In this case, the investors tracked down the Company's former President, Shu Kaneko, here in the United States. A receiver was appointed for the Company and the receiver initiated this action against Kaneko and others to recover, *inter alia*, amounts that Kaneko allegedly diverted from Company accounts.

According to Kaneko, after he resigned from the Company but prior to the initiation of this litigation, the Company gave him a general release of claims (the "Release") in exchange for his commitment to assist the Company in taking certain steps to firm up its capital structure in anticipation of a potential sale of the Company to a private equity firm. Kaneko has moved for summary judgment, *inter alia*, on the ground that the receiver's claims are barred by the Release. In response, the receiver argues that the release fails for lack of consideration. After carefully considering the undisputed evidence in the record, I am satisfied that the Release is binding and enforceable and that it releases Kaneko from all claims asserted against him in this litigation. Accordingly, Kaneko's motion for summary judgment must be GRANTED. Kaneko's counterclaim for indemnification under 8 *Del. C.* §145(c)

1

is STAYED. His request for fee shifting is DENIED. A determination of Kaneko's entitlement to mandatory indemnification for his fees and expenses will await a final, non-appealable judgment.

## I. BACKGROUND

The summary judgment record is extensive; it is comprised of deposition testimony and exhibits presented by both parties. For purposes of this Memorandum Opinion, I have focused on the facts relevant to the dispute concerning the validity of the Release.[1]

### A. The Parties and Relevant Non-Parties

Robert W. Seiden, Esq. (the "Receiver") was appointed as receiver over SCLI by order of this Court dated January 17, 2014, following the entry of a default judgment and subsequent contempt citation against SCLI in consolidated Section 220 actions. Defendant, Shu Kaneko, a resident of California, was previously President, Treasurer, Director, Secretary, and Chief Financial Officer of Southern China Livestock International, Inc. ("SCL International") and the President, Treasurer, Director of Business Development and Secretary of SCLI.

---

[1] The Court provided an extensive discussion of the background of this dispute in its decision on Kaneko's motion to dismiss. *Seiden v. Kaneko*, 2015 WL 7289338 (Del. Ch. Nov. 3, 2015).

SCLI, formerly known as Expedite 4, Inc., is a Delaware corporation that wholly owns SCL International. SCL International, in turn, is the holding company for Beijing Huaxin Tianying Livestock Technology, Limited, which holds the equity interests of its operating subsidiary, Jiangxi Yingtan Huaxin Livestock Limited. At all relevant times, these entities were engaged in various capacities in the business of breeding, raising and selling live hogs in the People's Republic of China.

## B. The Company Seeks to Recover Lost Shares

In 2012, the Company entered in a Business Services Agreement with HF Capital Advisors, LLC ("HF Capital") (defined in the agreement as "the Agent"). HF Capital is controlled by Alan Lewis. It performs advisory services for clients Lewis served through his employment with Hickey Freihofner, a division of Brill Securities.[2] Lewis had been previously engaged by the Company through Hickey Freihofner when the Company was looking to mitigate the financial consequences of its failure to consummate an initial public offering. His charge then was to solicit a private equity buyer for the interests of the Company's U.S. shareholders or, alternatively, to help the company become listed on a foreign stock exchange.[3] That engagement was ultimately unsuccessful. In 2012, hope sprang anew when the

---

[2] Aff. of Adrienne M. Ward in Supp. of Def. Shu Kaneko's Mot. for Summ. J. ("Ward Aff.") Ex. 32 ("Lewis Dep.") 47:10–48:14.

[3] Lewis Dep. 21:19–22:25.

Company contacted Lewis again to assist in the Company's renewed efforts to provide an exit for its U.S investors. The Company had been approached by two separate China-based private equity firms that were interested in making a sizeable investment and then taking SCLI public on the Chinese Main Board exchange.[4]

Lewis was interested in the business opportunity the Company was proposing, particularly because his prior contingent fee arrangement with the Company had not paid off. He was told that the focus of the engagement would be to address concerns raised by the potential private equity investors that the Company needed "to fix [its] structure with respect to . . . the [so-called] 'management shares' that were tied up in a 'Slow Walk Offshore Structure.'"[5] Lewis offered to assist the Company in securing the return of the management shares (at times referred to by the parties as the "Song Held Shares") in hopes that he might be given the opportunity to serve as a broker-dealer on the capital raise from the two private equity firms.[6]

---

[4] Lewis Dep. 43:17–44:2.

[5] Lewis Dep. 44:8–16. The management shares represented 90% of the shares issued in the reverse merger transaction between SCLI and SCL International, which were to be held by Liquang Song pursuant to a lockup agreement. Song agreed to hold the shares because the Chinese stockholders could not acquire them directly due to certain Chinese laws and regulations by the State Administration of the Foreign Exchange. The stockholders, therefore, entered into earn-in agreements with Song which gave them the option to purchase the shares from Song for nominal consideration subject to the fulfillment of certain conditions. Ward Aff. Ex. 6 at 36.

[6] Lewis Dep. 45:22–46:3.

4

Once engaged by SCLI, Lewis reached out to Kaneko to see if he might assist in securing the return of the management shares.[7] During the course of their initial discussion, Kaneko made clear to Lewis that he had done nothing wrong and owed the Company nothing.[8] Nevertheless, according to Lewis, Kaneko appeared "eager to cooperate and help clear his name."[9] After the call, Kaneko made contact with the various parties who held the management shares in order to secure their signatures on the paperwork the Company needed to secure the lost shares.[10]

When Lewis and Kaneko spoke again, Kaneko advised Lewis that "because [the shareholders] knew that various parties, including the company, were alleging that they had—that Shu in particular, had misappropriated funds, they all requested a liability waiver. . . ."[11] In response, Lewis directed Darren Ofsink, an attorney who had been retained by the Company to handle the legal issues associated with the return of the management shares, to "begin preparing the paperwork for the transfer of the shares and the liability waiver in connection with that."[12]

---

[7] Lewis Dep. 63:12–65:4; Ward Aff. Ex. 31 ("Kaneko Dep.") 346:13–20.

[8] Lewis Dep. 70:17–71:1.

[9] Lewis Dep. 71:2–11.

[10] Lewis Dep. 71:13–19.

[11] Lewis Dep. 72:11–18.

[12] Lewis Dep. 72:21–23.

The agreements—both the signed Release and the signed agreements from the shareholders evidencing the transfer of the shares back to the Company—were held in escrow by Ofsink and then released once all signed agreements had been obtained.[13]  The board of directors of SCLI executed a written consent five months later in July 2013 resolving that "it is in the best interest of the Company to enter into the Settlement Agreement, the Kaneko Agreement, the Escrow Agreement and the Business Services Agreement . . . and each of the Agreements be, and hereby is, approved, ratified, and confirmed in all respects . . ."[14]

## C. Procedural History

The Receiver filed the original complaint in this action on July 7, 2014, almost one year after the Company had signed the Release.  He filed the First Amended Complaint ("FAC") on December 19, 2014, in which he asserted seventeen causes of action against Kaneko and others including, *inter alia*, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conversion, fraudulent transfer, unjust enrichment and corporate waste.  On January 30, 2015, Kaneko filed a motion to dismiss the FAC. That motion was granted in part and denied in part in the Court's Memorandum Opinion and Order dated November 3, 2015.  Kaneko answered the

---

[13] Lewis Dep. 74:14–75:2.

[14] Ward Aff. Ex. 27

6

FAC on November 18, 2015, and asserted a Verified Third Party Claim against SCLI for indemnification pursuant to 8 *Del. C.* §145(c). Kaneko has now moved for summary judgment.

## II. LEGAL ANALYSIS

"The function of summary judgment is the avoidance of a useless trial where there is no genuine issue as to any material fact."[15] "[T]he moving party initially bears the burden of showing that [no material issues of fact] are present."[16] If the "motion [] is 'supported' by such a showing, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact."[17] The court must view the evidence most favorably to the non-moving party, but may not look to the allegations or denials in the pleadings when determining whether a material issue of fact remains for trial.[18] Any such determination must be made from competent evidence in the summary judgment record.[19]

---

[15] *Emmert v. Prade,* 711 A.2d 1217, 1219 (Del. Ch. 1997).

[16] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

[17] *Id.* at 681 (internal citation omitted).

[18] *Fike v. Ruger*, 754 A.2d 254, 260 (Del. Ch. 1999), *aff'd*, 752 A.2d 112 (Del. 2000).

[19] *Id.*

7

## A. The Release

Delaware law recognizes that general releases serve as an "important tool for settling disputes precisely because they are designed to provide complete peace."[20] "[A]n effective release terminates the rights of the party executing and delivering the release and . . . is a bar to recovery on the claim released."[21] "When determining whether a release covers a claim, 'the intent of the parties as to its scope and effect are controlling, and the court will attempt to ascertain their intent from the overall language of the document.'"[22] "Delaware courts recognize the validity of general releases,"[23] and acknowledge that the standard language of such releases is "intended to cover everything—what the parties presently have in mind, as well as what they do not have in mind."[24] "If [a subsequent] claim falls within the plain

---

[20] *Seven Invs. LLC v. AD Captial LLC*, 32 A.3d 391, 397 (Del. Ch. 2011).

[21] *Id.* at 396 (quoting *Hicks v. Soroka*, 188 A.2d 133, 138 (Del. Super. Ct. 1963)).

[22] *Id.* *See also Adams v. Jankouskas*, 452 A.2d 148, 155–156 (Del. 1982) (where "the language of the release is clear and unambiguous, it will not lightly be set aside.") (internal citations omitted).

[22] *Riverbend Cmty., LLC v. Green Stone Eng'g LLC*, 2012 WL 1409013, at *6 (Del. Super. Ct. Apr. 4), *aff'd*, 55 A.3d 330 (Del. 2012).

[23] *Deuly v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1163 (Del. 2010), *cert denied*, 563 U.S. 938 (2011).

[24] *Corp. Prop. Assocs. 6 v. Hallwood Gp., Inc.*, 817 A.2d 777, 779 (Del. 2003) (quoting *Adams*, 452 A.2d at 156 (Del. 1982)).

language of [a] release, then the claim should be dismissed."[25]   The only circumstances in which a release would be set aside are "fraud, duress, coercion, or mutual mistake. . . ."[26] And "the party seeking to nullify the release bears the burden of demonstrating by clear and convincing evidence that the release is invalid."[27]

If the Release is valid and applies to the conduct alleged in the FAC, then any factual disputes that may exist regarding Kaneko's conduct are irrelevant because the claims would be barred as a matter of law.  I address the release issue in two parts: (1) does the language of the Release bar the Receiver's claims?; and, if so (2) is the Release supported by adequate consideration and otherwise valid and binding upon the parties?

### 1.    The Scope of the General Release

The Release contains a mutual release of liability for both the Company and Kaneko.  In releasing Kaneko, the Company represented, *inter alia*, that it:

> hereby forever releases and discharges each Shu Release Party (defined to include Kaneko) from all actions, any causes of action, suits, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which against any Shu Release Party, any Company Release Party ever had, now have or hereafter can, shall or may, have for, upon, or by reason of any matters,

---

[25] *Id.*

[26] *Riverbend Cmty., LLC*, 2012 WL 1409013, at *6.

[27] *Id.*

9

cause or thing whatsoever from the beginning of the world to the day of the date of this Agreement.[28]

This is standard general release language. It reflects the Company's intent to release all accrued claims the Company may have had against Kaneko sounding in law or in equity.[29] Kaneko gave identical covenants in favor of the Company. I need not parse through this language because, on its face, it clearly and unambiguously captures the alleged wrongdoing contained in the FAC.

## 2. The General Release Is Valid

Before considering whether any material factual disputes exist concerning the validity of the Release, I must first address the Receiver's argument that this Court has already determined that the Release is invalid for lack of consideration when ruling on Kaneko's motion to dismiss. The Receiver is wrong. In its decision on the motion to dismiss, the Court made clear that it was drawing all reasonable inferences that logically flow from the well-pled facts in the plaintiff's favor, as it is required to do on a Rule 12(b)(6) motion.[30] In opposing the motion to dismiss, the Receiver pointed to his complaint and argued that because the Song Held Shares

---

[28] Ward Aff. Ex 26.

[29] *Seven Invs*, 32 A.3d at 397 ("[General releases] are an important tool for settling disputes precisely because they are designed to provide 'complete peace.'") (quoting *In re Phila. Stock Exch., Inc.*, 945 A.2d 1123, 1137 (Del. 2008)).

[30] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

were not permitted to be transferred under a lockup agreement, SCLI was already entitled to a return of those shares and therefore their return to the Company did not constitute consideration to support the Release. Kaneko argued in response that the Company approached him with the idea of the Release and that it would not have done so if it saw no value in what it was seeking in return. On this point, Vice Chancellor Noble concluded that "[p]laintiff's allegations regarding Kaneko's extended control over SCLI and SCL International, however, cast doubt on this reasoning and, *with all reasonable inferences drawn in Plaintiff's favor*, suggest that the Company may have offered this deal intending to insulate Kaneko from liability for his alleged fraudulent scheme . . ."[31]

Because Vice Chancellor Noble did not make definitive findings of fact on the motion to dismiss, but appropriately accepted all well-pled facts as true and drew all reasonable inferences in the Receiver's favor, his conclusion regarding the lack of consideration for the Release cannot be the law of the case. While it is "established that a trial court's previous decision in a case will form the law of the case for the issue decided," our Supreme Court has explained that the doctrine only applies "provided the facts underlying the ruling do not change."[32] In this instance,

---

[31] *Seiden*, 2015 WL 7289338, at *6 (emphasis added).

[32] *State v. Wright*, 131 A.3d 310, 321–22 (Del. 2016).

11

the law of the case doctrine is inapplicable not because the facts have changed, but because the underlying facts were never conclusively determined.

Turning to the merits, the Receiver raises three grounds upon which the Court can disregard the claim preclusive effects of the Release, each of which, according to the Receiver, implicate disputed issues of material fact: (a) the Release should be disregarded because Kaneko's control over SCLI prevented SCLI from entering into an arm-length agreement with him; (b) the Release was not supported by valid consideration; and (c) Lewis lacked authority to enter into the Release on behalf of the Company. Having now thoroughly reviewed the evidentiary record, I am satisfied that no such material factual disputes exist and that the Receiver's arguments with respect to the Release fail as a matter of law.

### a. No Evidence That Kaneko Controlled SCLI at the Time of the Release

The Receiver argues that the extent to which Kaneko exercised control over SLCI is a contested issue of fact that precludes summary judgment. The record reveals no such dispute. While the Receiver has pointed to evidence that Kaneko may have exercised some control of the Company's bank accounts while serving as CFO, and perhaps for some time after he left that position in 2010, the Receiver has failed to identify any evidence that Kaneko exercised any control over the Company (and particularly its board of directors) at the time Lewis negotiated and the Company entered into the Release in 2013. In fact, the Receiver admits as much

12

when it argues that "Kaneko is contorting the facts showing he had control well into March, 2012."[33]  The Receiver's evidence of Kaneko's purported control, even if present in the record, stops approximately ten months short of the relevant time frame.

In what can fairly be characterized as a Hail Mary, the Receiver argues that an issue of material fact concerning Kaneko's control at the time of the Release exists because "[a]t the time the Release was signed, Kaneko was the only one who could facilitate the return of the Song Held Shares, supporting that he maintained control, either directly or indirectly, even after he no longer worked directly for SCLI, and was an officer of Yu Shu Mei, one of the entities that held the Song Held Shares."[34]  This logic is hard to follow.  The fact that Kaneko was positioned to secure the return of the Song Held shares, the very consideration he brought to the bargain, is hardly evidence that he controlled the Company, directly or indirectly, at the time of the Release.

### b. The Release Is Legally Valid

The Receiver's next argument is that disputed issues of material fact exist concerning whether the Release was supported by consideration and otherwise

---

[33] Answering Br. of Pl. in Opp'n to Def.'s Mot. for Summ. J. ("Answering Br.") 22.

[34] Answering Br. 20.

enforceable. "It is the blackest of black-letter law that an enforceable contract requires an offer, acceptance, and consideration."[35] As our Supreme Court has explained, "it is well settled that consideration for a contract can consist of either a benefit to the promiser or a detriment to the promisee."[36]

The Receiver raises several arguments to convince the Court that disputed issues of material fact exist for trial concerning both the facial validity of the Release and the adequacy of the consideration supporting the Release. None is persuasive.

First, the Receiver lists several markers that suggest the Release is facially invalid, including that the Release lacks the Company "Chop," that it was not translated into Chinese (the native language of the Company's CEO), that Lewis was conflicted because his compensation (approximately $110,000) was tied to the return of the Song Held Shares, that Lewis did not tell the investors about the Release and that the Company's CEO was not included on the email chain between Lewis and Kaneko when they discussed the Release. None of these observations, either alone or together, provides any basis to invalidate the Release.

While the record reflects that in China a company's "chop" (seal) acts as a signature, the record also reveals that SCLI and other Chinese companies do not

---

[35] *James J. Gory Mech. Contracting, Inc. v. BPG Residential P'rs V, LLC*, 2011 WL 6935279, at *2 (Del. Ch. Dec. 30, 2011) (internal citation omitted).

[36] *First Mortg. Co. of Pa. v. Fed. Leasing Corp.*, 456 A.2d 794, 795–96 (Del. 1982) (citing *Affiliated Enters. v. Waller*, 5 A.2d 257 (Del. 1937)).

14

always affix the corporate seal to all corporate documents. As Lewis explained, "sometimes the companies in China use chop; sometimes they don't."[37] As for the translation issue, while the record suggests that the Release was not translated into Chinese,[38] the Receiver has pointed to nothing—no testimony, no legal authority—that suggests that the lack of translation will affect that validity of the Release. As discussed below, the fact that the full board of directors of SCLI, including the CEO, subsequently ratified the Release is powerful, undisputed evidence that the Company knew what it had agreed to.[39] With regard to the argument that Lewis had a conflict of interest because he was compensated, the Receiver has failed to explain how the fact that the Company agreed to compensate Lewis if he was successful in securing the lost shares supports an argument that Lewis was conflicted or lacked authority to do what the Company expressly engaged him to do. Finally, the Receiver has failed to articulate how the validity of the Release depends in any way upon Lewis copying the Company's CEO on email correspondence or the Company discussing

---

[37] Lewis Dep. 167:10–11.

[38] Lewis Dep. 165:23–166:4 (Q. "Also would you agree that the release agreement—the settlement and release agreement signed by Kaneko and by Pan was not translated into Chinese, correct?" A. "I'm not aware of either way. I don't know whether Meng orally or in writing translated that for them.").

[39] Lewis Dep. 85:16–19 (Q. "And so—and at the time that you e-mailed Mr. Kaneko, the concept of entering into a settlement agreement had already been approved by the company?" A. "Yeah, uh-huh."); Ward Aff. Ex. 27

the document with the investors. The board of directors was empowered to manage the Company and the undisputed evidence clearly demonstrates that the board was aware of and ultimately approved of the Release.[40] The Receiver has not presented any evidence to the contrary.

The Receiver's attempts to gin up issues of fact relating to the adequacy of the consideration supporting the Release fare no better.[41] First, the Receiver argues that the Release is unsupported by consideration on its face because "there is no enforceable provision that states that Kaneko facilitating the return of the Song Held Shares was the consideration for SCLI releasing its valuable claims against Kaneko . . ."[42] This, of course, assumes that parties to a contract must explicitly detail the precise consideration they are exchanging. The law makes no such

---

[40] This argument also completely ignores the fact that the only investor deposed in the case acknowledged that he was not challenging the Company's decision to offer Kaneko the Release and had no reaction upon learning of it. Ward Aff. Ex. 33 ("Hinds Dep.") 151:18–152:8.

[41] To be sure, whether a contract is supported by adequate consideration is a mixed question of law and fact. *Wilm. Hospitality, LLC v. New Castle Cnty.*, 2007 WL 1248513 (Del. Super. Ct. Apr. 26, 2007) (finding that a factual dispute existed as to whether a prohibition contained in a contract was a pre-existing duty or consideration and therefore summary judgment was inappropriate). In this case, however, the Receiver has advanced neither a valid legal argument nor disputed issues of material fact that would support his contention that the Release fails for lack of consideration.

[42] Answering Br. 42.

16

requirement.[43]    Moreover, the undisputed evidence makes clear that everyone involved in the negotiation and execution of the Release understood the overarching purpose for the Release and the specifics of what each party was giving and getting.[44]

Next, the Receiver argues that any consideration given to support the Release might in fact be "past consideration."[45]    Nothing in the Release supports this supposition.[46]    Moreover, the testimony in the record reveals that both parties held their signed copies of the Release in escrow until all mutual covenants were fully

---

[43] *Equitable Trust Co. v. Gallagher*, 99 A.2d 490, 492–93 (Del. 1953) ("[C]onsideration is to be detected if it is present anywhere in the transaction in question, regardless of whether any label was put on it, and regardless of whether it was spelled out in the paper-writing").

[44] Ward Aff. Ex 24 (January 5, 2013 email from Lewis to Kaneko in which Lewis says "I've talked to the company and management seems open to offering you both a full liability waiver and drop the lawsuit re: the misplaced company funds so that you can move on with your life, in exchange for your cooperation in turning over the management shares that you/Liqiang hold in trust, along with the consultant shares held by Shing Wing Development, Yu Shumei, Gao Suhua and Alexandria Captial.  More than anything, I believe the company owners really just want to collapse their offshore US structure and go back to being pig farmers in China without the headache of dealing with demanding US investors.").

[45] Answering Br. 43 ("Further, while Kaneko argues that he had no obligation to assist in returning the shares, the Release unequivocally states that Kaneko had already provided the facilitation of the return of the Song Held Shares prior to the Release being entered into . . . . [t]his is further supported because the so called board vote to approve the Release occurred over five months after the Release was entered into . . .").

[46] This argument also ignores the fact that the Company and Kaneko entered into a mutual release within the Release itself.  This mutual release of all claims would itself be sufficient to constitute adequate consideration.  *Fuller v. Gemini Ventures, LLC*, 2006 WL 2811708, at *4 (Del. Super. Ct. Oct. 2, 2006) ("The Release recites mutual promises and agreement which support consideration for a valid release.").

17

performed, a fact that reveals the parties' belief that their performance obligations were ongoing and not yet satisfied.[47] The consideration was very much "present" consideration.

In a final attempt to raise a disputed issue of material fact concerning consideration, the Receiver says that a dispute exists with regard to whether SCLI received something more than it was already entitled to receive. Essentially, the Receiver says that the Song Held Shares never should have been transferred in the first place and that SCLI was already entitled to them at the time of the Release. While the Receiver may well be correct that the Song Held Shares should not have been transferred, the fact remains that the Company did not, in fact, have the shares when it needed them to begin serious negotiations with the private equity company that was potentially willing to provide an exit for the US investors.[48] Kaneko was

---

[47] Lewis Dep. 74:14–75:2 ("And then Shu—Shu wanted to make sure that he had the company's signature on the liability waiver in connection with—you know, before tendering—you know, getting all the shares, and so we had those escrowed with Darren, you know, the signatures, and both parties signed, and that transaction was done in that sense." Q. "And so if I understand correctly, the company signed the documents before you had obtained the signature from Mr. Kaneko, and those signed pages were being held in escrow by Darren Ofsink?" A. "I can't remember who signed first, but both parties were okay with giving them into escrow with Darren.").

[48] Lewis Dep. 168:8–10 ("[T]he U.S. investors were very upset with being stranded, so to speak, without liquidity . . ."); *see also* Hinds Dep. 87:9–15 ("He [Lewis] wanted to reengage with the company to try to find a buyer, and we were trying to figure a way to do that because it seemed to me at the time that was the only way that we were – as investors in this company, was the only way that we were going to be able to get any cash out or return of cash on our investment.").

the person best positioned to help retrieve the shares so that the Company could pursue this transaction.[49] Given these facts, there can be no bona fide dispute that the Company considered the return of the Song Held Shares to be valuable consideration.[50] The fact that the transaction did not ultimately close subsequent to the return of the Song Held Shares provides no basis to mount an after-the-fact attack on the adequacy of the Release's consideration.

### c. Lewis Was Authorized to Negotiate and Sign the Release

The Receiver's final ground collaterally to attack the Release is that a material factual dispute exists with respect to whether Lewis had the proper authority to negotiate the Release on behalf of the Company. This argument can be disposed of summarily. First, the record shows that Lewis entered into a business services agreement with the Company in which the parties agreed that Lewis would "obtain the assignment, conveyance, cancellation or similar transfer of the Company 4,386,438 shares held by Shu Mei Yu, Ltd. (the "Management Shares") and (iii) obtain the assignment, conveyance, cancellation or similar transfer of as many Company shares held by the four consultants as possible (the "Consultant

---

[49] Kaneko Dep. 361:2–8 (Q. "So how come you, of all people in the whole world, were somebody that [Lewis] reached out to, to try and get these shares back?" A. "Oh, because I had a relationship, I know people who needs [sic] to sign, stuff like that.").

[50] *See, e.g.* Lewis Dep. 84:19–23 ("[T]he company was very embarrassed and concerned and just frightened by all this. They had received you know, lawsuit threats from U.S. investors, such as Will Hector, and they were frustrated that things hadn't worked out . . .").

Shares").”[51]  While the business services agreement did not define the specific steps Lewis was authorized to take to achieve that goal, the undisputed evidence in the record demonstrates that the Release was approved by the Company prior to its execution.[52]  Lewis presented the idea to the Company and then explained the reasons the Company should consider pursuing this course with Kaneko to ensure the return of the lost shares.[53]  Thereafter, the full board of directors of SCLI ratified

---

[51] Ward Aff. Ex 21.

[52] Lewis Dep. 85:2–85:19 (A. “[T]here was a lot of disagreement about, ‘Do we sue to show the investors’—and this is per Meng Qinghuan—‘Do we sue to show the investors that we’re trying to recover funds, or do we try go this route of recovering the shares and trying to raise capital through the PRC firms?’  So there were some big debates. And I told him, you know, in order for me to get the shares back, that they would have to wait to sue and this if they were to sign a liability waiver, then they wouldn’t have the ability to sue.” Q. “Okay. And do you believe that Meng understood that concept?” A. “Yeah.”  Q. “And so—at the time you e-mailed Mr. Kaneko, the concept of entering into a settlement agreement had already been approved by the company?” A. “Yeah, uh-huh.”).

[53] Lewis Dep. 86:1–23 (Q. “And so, to your memory, Mr. Kaneko is not the one who suggested entering into a settlement agreement?” A. “No. Yeah, I indicated at some point, whether it was in connection with the negotiations for the business services agreement engagement or thereafter, that if I were to get—if I was successful in getting ahold of Shu or Song, that I didn’t think that they would—that they wouldn’t have any incentive to cooperate in getting the shares back without having a liability waiver, just because, you know, that would be what I would ask for if I were in Shu’s shoes . . . [the Company] wanted me to try to attempt to get an admission of guilt and get some funds back . . . on my first phone conversation with Shu, he denied that and any wrongdoing on his part, and so I indicated to the company that that would not happen.  I told them I’d try.  *And so then at that point they were fine with just the liability waiver and the – in exchange for the shares.*”) (emphasis added); *see also* Ward Aff. Ex 24 (“I’ve talked to the company and management seems open to offering you both a full liability waiver . . .”); Kaneko Dep. 359:11–360:3 (Q. “Okay. So then he goes on to say, two paragraphs down, he says: I was able to convince the company that it’s in their best interest for a peaceful resolution . . . . [d]id he talk about that further with you?” A. “Oh, yeah, he talked about—well he, talked

20

the decision to enter into the Release.[54]  Thus, while the undisputed evidence raises no question regarding Lewis' authority to negotiate the Release, even if it did, the fact that the board subsequently ratified the corporate act moots any argument that the Release is voidable.

## B. Kaneko's Claims for Indemnification Will Be Stayed

Kaneko has moved for summary judgment on his counterclaim for mandatory indemnification pursuant to 8 *Del. C.* § 145(c).  Kaneko's logic is that if he is successful on his motion for summary judgment with respect to the Receiver's claims, he has then been successful on the merits in defense of claims brought by reason of the fact that he was an officer of SCLI.  Kaneko's logic neglects one critical consideration, however.  This opinion is not a final, non-appealable judgment.  This Court has been clear that "[i]t is generally premature to consider indemnification prior to the final disposition of the underlying action."[55]  Considerations of "litigative efficiency" and the conservation of judicial resources lend support to this outcome.[56]

---

about the recent agreement, said if I can help the company to get the shares back . . . the company will agree to set—or, to the Settlement Agreement.").

[54] Ward Aff. Ex 27.

[55] *Paolino v. Mace Sec. Int'l., Inc.*, 2009 WL 4652894, at *4 (Del. Ch. Dec. 8, 2009).

[56] *Simon v. Navellier Series Fund*, 2000 WL 1597890, at *9 (Del Ch. Oct. 19, 2000) ("As a general matter, similar considerations would seem to counsel against the adjudication of an indemnification claim until a definitive outcome is reached in the underlying matter. In the absence of a showing of undue hardship, such an approach will reduce the chance that

21

For this reason, the counterclaim for indemnification will be stayed pending a final, non-appealable judgment.[57]

## C. Kaneko is not Entitled to Fee Shifting

Kaneko requests that this Court shift fees based on the bad faith exception to the American Rule. According to Kaneko, the Receiver knew of the Release at the time it initiated this litigation and yet it pursued its claims anyway. As this court has made clear, "[t]he bad faith exception is not lightly invoked."[58] "The party seeking to invoke the [bad faith] exception must demonstrate by clear evidence that the party from whom fees are sought acted in subjected bad faith."[59]

Kaneko argues he has presented clear evidence of bad faith because the Receiver's arguments attacking the Release had no basis in fact from the outset of the litigation. I disagree. The Receiver pled facts based on what he knew prior to discovery. The claims he asserted based on these facts, for the most part, survived

---

the court will engage in a wasteful exercise in predictive justice, only to see its work undone by a reversal of the trial court's judgment in the underlying matter.").

[57] *Paolino*, 2009 WL 4652894, at *4–5 (considering *sua sponte* whether indemnification claim should be stayed pending final disposition and stating that "[t]his Court possesses the inherent power to manage its own docket, including the power to stay litigation on the basis of comity, efficiency, or simple common sense."). The Court has determined that there is "no just reason for delay" of the entry of judgment on the Receiver's claims pursuant to Court of Chancery Rule 54(b). This judgment, therefore, is appealable now.

[58] *Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 880 (Del. Ch. 2012) (internal quotation omitted).

[59] *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015).

a motion to dismiss. Now that discovery has run its course, the facts make clear that the Receiver's claims, while potentially valid on the merits, are barred by the Release. This series of events falls well short of providing any basis to conclude that the Receiver acted in subjective bad faith in bringing the FAC against Kaneko.[60] Kaneko may ultimately be entitled to reimbursement of his fees and expenses through the mechanism of mandatory statutory indemnification, but he is not entitled to them based on a shifting of fees as a result of bad faith litigation conduct.

## III. CONCLUSION

In this case, it is clear from the undisputed evidence of the record that the Release is a binding and enforceable obligation of the Company entered into with Kaneko at a time when the Company was in need of his help. The merits of the allegations concerning his potential misappropriation of funds or other corporate wrongdoing became moot the instant the Release was signed. The Release was negotiated at arms-length, supported by consideration, entered into with proper authority and subsequently ratified by the Company's board of directors.

---

[60] *In re Grupo Dos Chiles, LLC*, 2006 WL 2507044, at *2 (Del. Ch. Aug. 17, 2006) (denying to award fees for bad faith conduct when such an award would punish a party "merely for making an ultimately unsuccessful argument").

23

For the foregoing reasons, Kaneko's motion for summary judgment is GRANTED. Kaneko's counterclaim for indemnification under 8 *Del. C.* § 145(c) is STAYED. His request for fee shifting is DENIED.

**IT IS SO ORDERED**.